L. R. BAIRD, as Receiver of the Bank of Sanborn, Sanborn, North Dakota, a Corporation, Appellant, v. FRED E. STEPHAN, Myrtle E. Stephan, Phillip Stephan and Minnie Stephan, Respondents.

(204 N. W. 188.)

**Guaranty — not binding on party executing it till delivered.**

1. A guaranty, like any other written contract, is not binding on the party who executed the same until it is delivered.

**Estoppel — party executing written guaranty and delivering it conditionally may, by subsequent conduct, become estopped to assert conditional delivery.**

2. A party who executes a written guaranty and delivers the same conditionally may, by his subsequent conduct, become estopped to assert such conditional delivery.

**Estoppel — if only one inference can reasonably be drawn from facts, whether they constitute estoppel is question of law, but otherwise it is for the jury.**

3. Where there is no dispute about the facts and only one inference can reasonably be drawn therefrom it is a question of law whether the facts proved constitute an estoppel. But under all other circumstances the question whether an estoppel exists is for the determination of the jury under proper instructions from the court.

Note.—(1) Necessity of delivery of guaranty, see 12 R. C. L. 1072;

(3) Estoppel as question of law or fact, see 10 R. C. L. 845; 2 R. C. L. Supp. 1090.

**Estoppel — evidence held to show estoppel as a matter of law to assert that guaranty was delivered conditionally.**

4. In the instant case it is held, for reasons stated in the opinion, that the defendants are estopped, as a matter of law, from asserting that a certain guaranty was delivered conditionally.

Opinion filed May 5, 1925.

Banks and Banking, 7 C. J. § 137 p. 536 n. 98. Estoppel, 21 C. J. § 116 p. 1113 n. 52, p. 1114 n. 53; § 120 p. 1118 n. 92; § 154 p. 1152 n. 94; § 269 p. 1252 n. 93; § 270 p. 1253 n. 97, 98. Guaranty, 28 C. J. § 45 p. 915 n. 15, 16, 17, 18; § 67 p. 927 n. 54; § 198 p. 1028 n. 43.

Appeal from the District Court of Barnes County, *Berry,* Special Judge.

Plaintiff appeals from a judgment and from an order denying his motion for judgment notwithstanding the verdict.

Reversed, and remanded with directions to render judgment in favor of the plaintiff.

*A. P. Paulson* and *D. S. Ritchie,* for appellant.

Formal notice of acceptance by the guarantee is not necessary, where the guarantor has notice or knowledge from any authoritative source, that the guarantee has accepted the guaranty and is acting on the faith thereof. 28 C. J. § 26, p. 905.

Acts of parties having full knowledge of facts are decisive. Intent of parties is, in all contracts, and especially commercial ones, 'the polestar of construction, and in ascertaining that intention courts always hold parties to their own construction of their obligations. Austin v. Wheeler, 16 Vt. 95.

A guarantor may, by inducing, approving, assenting to, or participating in, any course of dealings, contrary to the letter of the contract, be estopped to set up such variation as a defense. Phenix Mfg. Co. v. Bogardus, 231 Ill. 528, 83 N. E. 284.

The guarantor may ratify any irregularity or change in the contract which he has guaranteed, and his consent to the change or modification will bind him without any new consideration. 20 Cyc. 1445, 1456.

Delivery of an instrument imports a surrender or parting with possession for a permanent purpose. Western U. Teleg. Co. v. Locke, 107 Ind. 9, 7 N. E. 579.

If a person by his conduct induces another to believe in the existence of a particular state of facts, and the other acts thereon to his prejudice, the former is estopped, as against the latter, to deny that that state of facts does in truth exist. 21 C. J. 1060; Engen v. Matthys (N. D.) 196 N. W. 551.

The ground upon which the estoppel rests is that the conduct constitutes an implied representation of the truth of the state of facts in question. Wisconsin v. Torinus, 28 Minn. 175, 9 N. W. 725.

Estoppel by silence arises where a person who by force of circumstances is under a duty to another to speak, refrains from doing so and thereby leads the other to believe in the existence of a state of facts in reliance upon which he acts to his prejudice. 21 C. J. p. 1081; United States v. Schneider, 35 Fed. 107; Chicago, etc. Trust Co. v. National Storage Co. 260 Ill. 485, 103 N. E. 227; Wagener v. St. Paul, 82 Minn. 148, 84 N. W. 734.

The material recitals in a bond estop both principal and sureties in a bond as effectively as material recitals in a deed estop the parties thereto, subject, however, to the same exceptions and limitations. Dunterman v. Storey, 40 Neb. 447, 58 N. W. 949.

Equitable estoppel rests upon the fundamental principles of right and fair dealing; its creed is justice between man and man. Its objects are not punishment; its remedies are not penal. Its mission is to protect the innocent and blameless. Westbrook v. Guderian, 3 Tex. Civ. App. 406, 22 S. W. 59.

The primary ground of the doctrine is that it would be a fraud in a party to assert what his previous conduct has denied, when, on the faith of that denial, others have acted. Electric Light, etc. Co. v. Bristol Gas, etc. Co. 99 Tenn. 371, 42 S. W. 19.

The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Dickerson v. Colgrove, 100 U. S. 578, 25 L. ed. 618; Odlin v. Gove (N. H.) 77 Am. Dec. 773.

*Combs & Ritchie,* and *Divet, Holt, Frame & Thorp,* for respondents.

The distinction between the principle of estoppel by record or by deed in which case it becomes a matter of law and an estoppel in pais

in which it becomes a question of fact for the jury must be observed. 19 Am. Dig. p. 2459; Burbaker v. Okeson, 36 Pa. 519; Morrill v. Richey, 18 N. H. 295; Brown v. Bowen, 30 N. Y. 519; Calhoun v. Richardson, 30 Conn. 210; Jamison v. Miller (Iowa) 20 N. W. 491.

A judgment non obstante cannot be granted either by the district court on motion or by the supreme court on review when such motion and review are based upon "errors of law occurring at the trial" and when there is an issue for the jury to pass upon. McKenzie v. Bismarck Water Co. (N. D.) 71 N. W. 608.

Errors in instructions and errors of law occurring at the trial do not constitute grounds for a motion for judgment notwithstanding the verdict. Pease v. Magill (N. D.) 115 N. W. 260.

A judgment notwithstanding the verdict can be entertained only in the case where it appears upon the whole record that the moving party is as a matter of law entitled to judgment on merits. First State Bank v. Kelly (N. D.) 152 N. W. 125; Cruikshank v. St. P. F. & N. Ins. Co. 77 N. W. 958; Marquardt v. Hubner, 80 N. W. 617; Mehan v. G. N. R. Co. 101 N. W. 183; Kerr v. Anderson (N. D.) 111 N. W. 614.

Christianson, Ch. J. On February 26th, 1921, the Bank of Sanborn was closed. Thereupon, the State Examiner took charge, and one of his deputies made an examination of the bank. After such examination, the State Examiner advised the stockholders and directors that the bank would be permitted to re-open on the following conditions: (1) Each and all of the depositors therein must sign an agreement to leave their moneys then on deposit in the bank for a certain stated period of time; (2) the cash reserve required by law must be supplied; and (3) certain bills receivable (consisting of notes, and of certificates of deposit issued by other banks) must either be paid or guaranteed. The first and second conditions were complied with, and the above named four defendants executed and delivered to the State Examiner a written guaranty of the bills receivable. The bank was re-opened on August 1st, 1921. This action is brought upon the written guarantee. As a defense the defendants asserted that the guaranty was delivered on the condition that all the bills receivable covered by the guaranty should be delivered to Fred E. Stephan or Phillip Step-

han for collection, and that their receipt for such bills receivable should be attached to the written guaranty; that this condition was not complied with; and, hence, that there was no delivery of the written instrument, and it never became effective. The plaintiff claims that there was no condition attached to the delivery of the instrument; that the alleged condition is not one relating to the delivery, but is one relating to the terms, of the agreement, and that the evidence adduced by the defendants tending to establish the same was inadmissible on the ground that it tended to contradict or vary the terms of a written contract. The plaintiff further contends that even though the instrument was delivered on the condition defendants asserts, they subsequently waived the same; and by reason of their conduct have become estopped to assert that the instrument was delivered conditionally. These issues were the only ones raised upon the trial. There was a verdict in favor of the defendants, and the plaintiff has appealed from the judgment entered upon the verdict and from the order denying a motion for judgment notwithstanding the verdict.

The sole question presented on this appeal is whether the plaintiff is entitled to judgment notwithstanding the verdict. In other words, the question presented for determination is whether, upon the whole record, it clearly appears that the plaintiff is entitled to judgment on the merits as a matter of law. First State Bank v. Kelly, 30 N. D. 84, 152 N. W. 125, Ann. Cas. 1917D, 1044. The record shows that at the time the bank was closed and for a number of years prior thereto the defendant Fred E. Stephan was Vice President and active managing officer of the bank. The defendant Phillip Stephan is Fred E. Stephan's father. The defendants Myrtle E. Stephan and Minnie Stephan are respectively, the wife and mother of Fred E. Stephan. The Stephans were the owners of a large amount of the capital stock of the bank. After the State Examiner had made known the conditions on which he would permit the bank to be re-opened a meeting of stockholders was held on May 14th, 1921 at which the following proceedings were had:

"Moved and seconded that the proposal of Fred E. Stephan to furnish to the bank a written guaranty, to save the bank harmless of any loss for the foreign and local paper, which was disapproved by the

Bank Examiner, be submitted to a Committee of the stockholders for approval, be accepted. Carried.

"Moved, seconded and carried that ten stockholders be appointed as a Committee, such Committee to be appointed by the chair, to pass on guarantee by Fred E. Stephan as stated in preceding motion.

"The chair appointed the following: . . .

"Moved, seconded and carried that a committee of three be appointed by the Chairman to raise funds to build up the cash reserve of the Bank."

Both Fred E. Stephan and Phillip Stephan were present at and participated in this meeting. On June 11th, 1921, Lofthus, the State Examiner, came down to Sanborn and at that time the following guaranty was executed by the defendants, to-wit:

## Guaranty.

For and in consideration of the sum of One Dollar ($1.00) to me in hand paid by the Bank of Sanborn, Sanborn, North Dakota, a banking corporation, organized and existing under and by virtue of the laws of the State of North Dakota, the receipt whereof is hereby acknowledged, and the said Bank of Sanborn, being at this time in charge of the State Examiner of the State of North Dakota, in further consideration of the said Bank being permitted to re-open, I do hereby undertake, promise and agree to hold the said Bank of Sanborn harmless from loss or damage thru, by reason of, or on account of those certain notes, loans and certificates of deposit which are listed in the attached list marked "Exhibit A" and is hereby and thereby made a part hereof, and I do hereby guarantee the payment, as when the same shall become due or if the same be past due, and whether the same shall be renewed, of all of the said loans and notes and certificates of deposit so set forth in said Exhibit A, as and when payment thereof shall be demanded of me, and further that all of said notes, loans and certificates of deposit so listed in the said Exhibit A shall either be paid or removed from the said bank and that if removed, that either cash or the certificates of deposit issued therefor shall be paid to or returned to the said bank, to the end that the said Bank shall suffer no loss thereby and shall in all things be saved harmless.

I do further guarantee the payment of all notes, loans or other evidence of indebtedness, made or taken by the said Bank thru Fred E. Stephan, its managing officer, and do hereby agree to save the bank harmless from loss thereunder, which said loans, notes or other evidence of indebtedness were made or taken to aid or permit the makers thereof in the purchase of insurance, be the same fire or life insurance, or where such item goes to make up a part of any loan, note or evidence of indebtedness.

I do further agree that any note the payment whereof is hereby guaranteed may be by the said Bank renewed without notice to the maker of this guaranty, and that this guaranty shall cover as to the said renewed note with the same force and effect as though the same had not been renewed.

I do hereby in all things waive notice of protest and of demand, and do hereby waive notice of acceptance of this guaranty.

I do further agree that this guaranty shall be in full force and effect from and after the date hereof, and that the same shall in all things apply to loans made and paper now held by the Bank of Sanborn, and that the purpose of this guaranty is to guarantee the payment of the notes, discounts and certificates of deposit now held in or by said Bank as hereinbefore set forth.

I do further agree that this agreement shall be binding upon my heirs, executors and administrators.

It is further understood and agreed that time of payment under this guarantee shall be as and when each separate note, loan, discount or certificate of deposit shall become due as shown by the terms of the instrument itself.

Dated at Sanborn, North Dakota, this 10th day of June A. D., 1921.
Witness:

B. A. Dierdorff                    Fred E. Stephan
O. E. Lofthus                      Myrtle E. Stephan
                                   Phillip Stephan
                                   Minnie Stephan

As has already been indicated the undisputed evidence shows that

the State Examiner as a condition precedent to a reopening of the bank required that certain of the bills receivable of the bank be either paid or guaranteed. This condition was made known to the stockholders and the directors of the bank and was recognized at the meeting of stockholders held May 14th, 1921. The deputy examiner had prepared a list of the paper to be covered by such guaranty. The evidence shows that the other two conditions imposed were met, namely, an agreement was obtained, signed by the various depositors, by the terms of which they agreed to leave their money on deposit in the bank for a stated period of time; and sufficient moneys were obtained to provide the required cash reserve. The cash reserve was furnished in this manner: the defendant Phillip Stephan, made a deposit of $1,800.00 in cash, which deposit was made under an arrangement whereby it was not to be withdrawn by him. In order to make this deposit he sold $17,000.00 in liberty bonds. The bonds were sold at a discount of $2200.00, and all the other stockholders in the bank signed an agreement whereby they agreed to reimburse said Phillip Stephan for their proportionate share of such discount. On June 11th, 1921, the State Examiner came from Bismarck to Sanborn and saw the defendants Phillip and Fred E. Stephan.

The State Examiner testified that the purpose of the trip to Sanborn "was to get a certain guaranty signed up so that the bank could reopen," that he saw Phillip and Fred E. Stephan and that they and their wives executed the instrument in suit before a notary public. The State Examiner testified that no conditions whatever were attached to the delivery of the instrument; that the only conversation had was as regards the necessity of the guaranty, that is, that the bank could not and would not be permitted to open unless and until the objectionable paper (which the guarantee was to cover) was guaranteed; that there were no pledges as to where the notes were to be kept and no promise that the notes were to be delivered to the Stephans or either of them, except that such paper as they took up by payment would be delivered to them; that the conversation took place in a room in the bank; that nothing was said at all in such conversation to the effect that the guaranty should not be effective until the notes were delivered to the Stephans and their receipt therefor attached to the agreement. The undisputed evidence shows that the guaranty,

upon execution by the defendants, was delivered to Lofthus (State Examiner) and by him taken back to his office at Bismarck where it was kept until after the commencement of this action.

The defendant Fred E. Stephan testified that the State Examiner, Lofthus, came to Sanborn on the 10th or 11th of June, 1921, and that he and his father had a conversation with Mr. Lofthus in the bank; that Lofthus said, "I have only a little time to spend. Let's get busy. I want to see you in the back room." We proceeded into the back room; we talked about this guaranty; we talked first about the one that had been circulated and Mr. Lofthus had a copy of a guaranty and he said, "Now I have to get a guaranty signed up by somebody sufficient to cover this questionable paper" that the bank examiner has objected to or his deputy that he had out there. We discussed that for possibly an hour and a half right before dinner. At noon we went home to eat and left the signing until after dinner until we had a chance to look it over a little and think it over. The conversation in the morning was that he had come up for that guaranty and wanted to get it signed so that he could get back; that he had only a little time; that we had property enough for which he would take our names and take the guaranty. When he wanted my father to sign this guaranty my father wanted to know what he was to get, what protection he was to have, that he figured he had done enough in raising the cash reserve. "When my father brought up his question to Mr. Lofthus, as to what he was to get, what protection he was to have, Mr. Lofthus made the proposition that possibly it would be the best that we have the looking after of our own collections on this paper, to protect ourselves on this guaranty. That guaranty my father was going to sign, or that Mr. Lofthus asked him to sign." "The agreement was that in turning these notes over to us, he said we would have access, so that we could have access on the collections." These notes were to be delivered before the re-opening of the bank. Lofthus said that he was taking the guaranty back to Bismarck with him to complete the balance of the writing to be added to the instrument and that he would either return personally, or have his representative or someone come and check over or out to us before this opening. That is, check out these notes to us and have the receipt attached to the other documents so we would know the guaranty was accepted and we had full power to go ahead,

and protect ourselves on the collection of the notes. When his representative came, or he would come down on the day of the opening of the bank. My father would make the deposit of money and we would be given these notes. They would be turned over to us, for which we would give a receipt, the receipt to be pinned to the guaranty. Nobody ever delivered these notes to us, or offered to do so. We did not consider we were making a delivery of the guarantee. The guaranty was signed and the notary public "took the acknowledgments" thereon after we had the conversation with Lofthus.

Q. So that instrument was signed by you all after these conversations and after that Mr. Lofthus took it into his possession?

A. Yes. Mr. Lofthus told us on the 11th day of June that he would have to have that guaranty before he would let the bank re-open.

Phillip Stephan testified that Lofthus said he was there to get a guaranty signed up. *"I have to have a guaranty before this bank can reopen.* I understand that you folks have raised sufficient funds to re-open and you have to have the guaranty in order to re-open." He wanted to know how much cash we had raised and how we had raised it and all such things. We did not know anything about the guaranty. I said that I had raised the cash and let the others raise the guaranty and show their faith was good. He said that he would not have much time to get acquainted and that as far as bonds were concerned that we were sufficient, that if I went on the guaranty, and would sign the guaranty, that it probably would be sufficient.

Q. Go on and tell the jury what was said, the way it was to be fixed up. What, if anything, was said?

A. After he showed me a way that I could see fit to sign that guaranty and would be safe—he put up a proposition that these notes were supposed—or what was intended for the guaranty, which of course was a plain piece of paper, or something like that. I don't exactly recall anything he said, should be mentioned in the guaranty. He said all the notes mentioned in the guaranty that they would be turned over to us and Fred could look after the collection of them and see that they were collected, and we were to give a receipt for each and every one of them and these receipts were to be attached to the guaranty to make it a complete guaranty he said.

52 N. D.—37.

(There was an objection to the question and also a motion to strike the answer on the ground that it was an attempt to vary and change the terms of a written agreement. The objection was overruled and the motion denied.)

I did not ask Mr. Lofthus for the notes that day. After he read the guaranty I objected to signing it at all. He said that he would draw up some more papers and explain it a little more thoroughly but he would have to have some arrangement about it yet, and he would ask us to sign this and would take it home with him to complete it.

Q. When did he say that he was going to complete the instrument?

A. *He was to complete that before we could re-open the bank.*

Q. Where did he say that he was going to complete it and how?

A. He was not sure whether he would come back himself or have it done by one of his deputies.

Q. Then what did he say he would do when he got back to Sanborn, or his deputy?

A. They were to turn these notes over at that time, and it was supposed to be a complete guaranty then. The receipt was to be attached to the guaranty.

Q. Did you intend to deliver this paper to Mr. Lofthus as a guaranty when you gave it to him at Sanborn?

A. I just loaned it to him.

(This evidence was all admitted over the objection that it was an attempt to vary a written instrument by parol evidence.)

The defendant, Phillip Stephan, further testified that on the day before the bank was re-opened one Ritchie, one of the directors of the bank, who had been acting as attorney for the bank in matters incident to the re-organization and re-opening thereof, came to a field where defendant was working. That Ritchie said "that he had come there to get a check for the re-opening of the bank, get the money."

Q. What did you say?

A. I said that the guaranty had not been completed.

Q. Go on and state what else was said?

A. Why he called me away from the car, that is the way it was, about the distance of the length of this building. That's when we started to talk about this guaranty not being completed. He pulled

out of his pocket a letter which he said was from Lofthus, . . . stating that Fred could not be in the bank of Sanborn, as a collector or as an officer or anything. I can't recall every word stated, but that he was not to have any active part in the bank.

Q. What was said about that?

A. I told him that the guaranty was off then.

Q. Did you give him your check? A. I did not.

Q. Did you give him your check later? A. I did.

Q. For how much? A. $14,800.00.

Q. How did you happen to do that? A. Well, I did not know but what this was a scheme that the bank would not be opened. I wanted some evidence, some witnesses, you understand I had no security. I did not know whether this was a give-away or not. He asked me to get into the car and go to the other end of the field. He said "let's go over to Fred and he can explain it to you. He can understand these things better than you can." He said "I can see that you have no knowledge of this," I got into the car and we drove over. Before he drove over there, he said: "We will take care of this guaranty part all right." We drove over to see Fred about this check, about the check being a deposit to the Bank of Sanborn. It would be time enough to give it to them when they opened up in the morning. They decided it would be satisfactory to give the check in the morning on the re-opening of the bank, which I did give them the check. After they were through with the meeting, they installed the officers. I even drove to Valley City with him and took dinner with them. All the directors were at the meeting held August 1st, 1921. At that meeting there was turned over to me a written guaranty signed by the stockholders, for the $2200.00, the amount of the discount on liberty bonds which I had paid in order to obtain the $14,800.00 for cash reserve. That was the only guaranty that was talked about that day.

Q. Mr. Lofthus told you that morning when you had this talk, when he took the information on the property statement, and he got the information from Fred on his property statement, that this guaranty was taken to guarantee the payment of objectionable paper in the bank?

A. That is what it was taken for.

Q. That is what he told you? A. Yes.

Q. He told you it was taken for the bank, to indemnify the bank against any loss on that paper?

A. Yes he did, and he also agreed that those notes would be turned over to us.

Q. *And he told you that guaranty was required before the bank could be opened up? A. Yes.*

Q. *You voted for the opening of the bank? A. Yes.*

Q. The meeting on August 1st was a directors' meeting, was it? A. Yes.

Q. At that time you were a director in the bank?

A. We became directors in the bank that day. We qualified.

.    .    .    .    .    .    .    .    .    :    .    .

Q. You were in favor of opening the bank? A. Oh, yes.

Q. You did not say a word to the other directors in regard to this undertaking you and Fred had furnished?

A. That was enough said when I told them that was off. That was enough said.

Q. You did not tell them that. You told Dave Ritchie that? A. Yes.

Q. *You did not say a word on August 1st in regard to the guaranty being off? A. No.*

.    .    .    .    .    .    .    .    .    .    .

Q. *You knew that the Banking Department and the Bank of Sanborn required a guaranty before the bank could be opened on the objectionable paper?*

A. *Yes.*

Q. You knew that and understood that from the day the bank had closed or shortly after that? A. Yes.

Q. You made no demand on anyone for this paper between the 11th day of June and the first day of August for the purpose of having it collected? A. I should say not.

Q. *You made no demand for this paper on the day the bank opened, on August, either? A. No.*

Q. You raised no objection before the board of directors at that time, that the guaranty that had been signed and delivered, as you have testified to Mr. Lofthus, was incomplete?

A. No, there was nothing asked me anything like that.

Q. You did not volunteer any statement? A. No.

Q. You sat there silent? A. Yes.

Q. *You knew the Bank Examiner had made the stipulation that the bank could not be opened until the guaranty had been furnished and their cash reserve had been raised as required by the State Banking Department?*

A. *Yes, he mentioned that.*

One Dierdorff testified that he was cashier of the Bank of Sanborn at the time it closed in February, 1921, and that when the bank reopened in August, 1921, he was employed as Assistant Cashier and continued to serve in that capacity until in July 1921; that he was present at the meeting of directors held August 1, 1921, when the bank was reopened. That during the course of that meeting inquiry was made as to whether the guaranty required by the State Examiner of the objectionable paper of the Bank had been furnished; and that Phillip Stephan in reply to such inquiry stated that the guaranty had been furnished or "fulfilled"; that after the bank was reopened Phillip Stephan continued to participate in all of the directors' meetings for a year or so thereafter.

One Basset, who was installed as cashier of the bank on its reopening, testified that he was present at the meeting held August 1st, 1921; that some time prior thereto, and on or about July 7th, 1921 he came to Sanborn to check over the paper in the bank; that at this time a deputy State Examiner was in charge; that such deputy State Examiner had in his possession a copy of the written guaranty in suit and delivered the same to Basset; that later he (Basset) made inquiry from the defendant Phillip Stephan in regard to this guaranty and that said Phillip Stephan stated in substance that the guaranty had been executed in good faith by the several signers thereto. That at the meeting held on August 1, 1921, the directors discussed the question whether the several conditions imposed by the State Examiner had been complied with and that the question was specifically discussed whether a guaranty of the objectionable paper had been furnished; that in such conversation the guaranty in suit was considered and it was agreed that the same was acceptable to the directors. Basset further testified that at a directors' meeting held February 7th, 1922, the matter of the guaranteed paper was considered and that at that time Phillip

Stephan, in the presence of the directors, admitted liability under the guaranty and that a motion was made that Phillip Stephan and the cashier, Basset, get together and make a settlement of the interest that was due on the guaranteed notes. The minutes of the directors meeting held on that date contain the following entry:

"After some discussion in regard to the unpaid interest on the guaranteed paper it was decided that the cashier and Phillip Stephan arrange for some settlement in connection, the details being left to them."

Gulman, one of the directors of the bank, testified that he was present at and participated in the directors meeting held August 1st, 1921, at which the bank was re-opened; that he (Gulman) was elected president of the bank at that meeting; that at that meeting immediately before the bank was re-opened, the guaranty in suit was discussed; and that it was stated by Ritchie, in the presence of the defendant, Phillip Stephan, that the guaranty signed by the defendants had been obtained, and approved by the banking department.

Ritchie testified that he had a conversation with the defendant, Phillip Stephan, the day before the bank was reopened; that in that conversation nothing was said about the guaranty involved in this action; that the only subject discussed at that time was the $14,800.00 in cash to be advanced by the defendant, Phillip Stephan, and the guaranty to be signed by the other stockholders to repay Phillip Stephan the $2200.00 discount on liberty bonds, which he had been required to pay in order to obtain the $14,800.00; that this was the only guaranty discussed; and that Phillip Stephan did not say to him (Ritchie) that the guaranty in suit "was off," or say anything at all in regard to such guaranty. Ritchie further testified that he was present at the directors' meeting held August 1, 1921; that at this meeting, while the defendant, Phillip Stephan, was present and participated therein, the guaranty in suit was discussed, and specifically approved by the directors.

The minutes of the directors' meeting held August 1, 1921, were introduced in evidence. They contain no entry of any action relating to the guaranty in suit.

After the bank was reopened it continued to operate as a banking institution until in February, 1923, when it was again closed. In the

meantime this action had been instituted by the bank in March, 1922. It was continued in force by, and tried in the name of, the receiver.

Appellant contends:

(1) That the evidence tending to show the alleged conditional delivery of the guaranty was inadmissible, and should have been excluded, on the ground that it contradicted and varied the terms of a written instrument; and that with this evidence excluded it clearly appears that plaintiff is entitled to judgment upon the merits as a matter of law.

(2) That in any event the defendants are estopped, as a matter of law, from asserting that the guaranty was not delivered.

The questions thus presented will be considered in the order stated:

(1) In our opinion, the defendants were entitled to introduce evidence tending to show that the written guaranty was delivered conditionally only. Foot, Schulze & Co. v. Skeffington, ante, 307, 202 N. W. 642. For a written guaranty, like any other written contract, is not a valid or binding agreement until it is delivered. "And where under the agreement for the guaranty it is not to be delivered until a certain condition is performed, a delivery without compliance with such condition will not bind the guarantor, unless he waives the condition, or unless the guarantor places the instrument in the hands of the principal and he delivers it to the guarantee without notice, to the latter, of the condition." 28 C. J. p. 915.

(2) Are the defendants estopped, as a matter of law, from denying that the guaranty was delivered? After a careful consideration of the evidence we have reached the conclusion that this question must be answered in the affirmative. The undisputed evidence shows that at the time the bank was closed the defendants Fred E. Stephan and Phillip Stephan were stockholders therein; that for a number of years prior thereto the defendant, Fred E. Stephan, was the vice president and active managing officer of the bank. The bank became involved in financial difficulties, and was closed by its own officers, and placed in charge of the State Examiner. The State Examiner, after having examined the assets of the bank, prescribed certain conditions which must be met before the bank would be permitted to re-open. Among other conditions, he required that certain paper in the bank either be guaranteed or replaced with cash. The defendants were vitally inter-

ested in the bank and the re-opening thereof. They were anxious to have the bank re-opened. They took an active, if not a leading, part, in the steps taken looking toward a re-opening. At the stockholders meeting held May 14, 1921, Fred E. Stephan made the proposal that he would undertake to furnish the guaranty. On June 11, 1921, the defendants executed a written guaranty, which on its face was full and complete; and in no manner indicated that anything further remained to be done before it is effective. This guaranty they delivered to the State Examiner. At the time it was so delivered the State Examiner was in charge of the bank, and all the papers and securities thereof were under his control. A copy of the guaranty was placed in the hands of the deputy examiner in charge of the bank. The defendants were living in Sanborn. They had personal knowledge of all the conditions imposed by the State Examiner and which must be met before the bank could be reopened; they participated, actively, in the various meetings of the stockholders held interim the closing of the bank and the reopening thereof; they knew that the only guaranty of the objectionable paper which had been executed in conformity with the demand of the State Examiner was the guaranty involved in this suit; they knew that the other stockholders and directors had knowledge of this guaranty and were relying thereon; they knew that the bank was reopened for business on August 1st, 1921, and from that time on continued to receive deposits and operate generally as a banking institution. The defendant Phillip Stephan was elected a director of the bank while it was being reorganized. As such he participated in the directors meeting on August 1, 1921, and aided in reopening the bank. He continued to serve as a director for about one year and as such participated in the various meetings of the board of directors held subsequent to the reopening of the bank. And with the single exception of the statement Phillip Stephan claims to have made to Ritchie the day before the bank was reopened, there is no contention that either Phillip Stephan or any of the other defendants in any manner indicated to any of the directors or officers of the bank that the guaranty had been delivered conditionally only. And under the evidence in this case there is, we think, no room for doubt but that at the time the bank was reopened all of the directors (with the possible exception of Ritchie) in good faith believed that the guaranty had been executed and delivered

in accordance with the demand of the State Examiner and was in fact and in law in full force and effect; that the directors caused the bank to reopen and continued to permit it to remain open in full confidence that the guaranty, of which they had a copy, had been executed and delivered in accordance with the demand of the State Examiner and was a valid and binding guaranty in favor of the bank. The only notice which the defendants claim to have given to any officer of the bank to indicate that the guaranty was not in effect is the statement which Phillip Stephan claims he made to Ritchie the day before the bank was opened. This statement was occasioned by a letter of the State Examiner to the effect that the defendant Fred E. Stephan "could not be in the Bank of Sanborn as a collector or as an officer or anything . . . that he was not to have any active part in the bank." It will be noted that there is no claim that anything was said in regard to the conditions which the defendants now claim were attached when the instrument was delivered to Lofthus. But in any event the statement to Ritchie was not notice to the bank or to any of the other directors or officers thereof. 7 C. J. p. 536. And on the day following this statement Phillip Stephan went into conference with the other directors and voted to reopen the bank and drew his check for $14,-800.00 to supply the required cash reserve and obtained from the other stockholders of the bank an agreement to reimburse himself for the discount for the liberty bonds which he had sold in order to obtain this money. According to his own testimony, Phillip Stephan knew that the directors were not permitted to reopen the bank unless and until the objectionable paper had been satisfactorily guaranteed. Yet, he participated in the directors' meeting held August 1, 1921, and voted to reopen the bank and said nothing whatever to the directors then assembled to the effect that the guaranty of the objectionable paper had never been delivered and was ineffective. Under the evidence there can, we think, be no doubt but that he realized that the directors were acting in the belief that a guaranty satisfactory to the State Examiner had been executed and delivered by the defendants. He permitted the directors to act in this belief and joined them in voting to reopen the bank. Afterwards he participated as a director in the management of the bank and permitted it to remain open and continue its business without the slightest suggestion that the guaranty had not been deliv-

ered and, hence, was not binding. The defendants at no time demanded a return of the guaranty.

While it is true, as asserted by respondents, that whether there is or is not an equitable estoppel in any given case depends upon the facts in that case, and, hence, is generally a question for the jury; it is equally true, that where only one inference can reasonably be drawn from certain controlling and undisputed facts the question of estoppel is one of law; and it is for the court to determine whether the facts established constitute an estoppel. 21 C. J. 1253.

In the case at bar the question of estoppel was virtually withdrawn from the consideration of the jury. During the introduction of the evidence, and following an argument as to the admissibility of certain evidence, which argument was made in the absence of the jury, the trial court said:

"I don't see what I can do in this case except that I submit it to the jury. *I can't see where the doctrine of estoppel could possibly apply to the question of the delivery. If the instrument was never delivered, they never could be estopped.* On the question of the other defense, if it was delivered as a matter of law, if it was delivered to the bank, then possibly the doctrine of estoppel would operate."

In its instructions to the jury the court said:

"Gentlemen of the Jury, if you find from a preponderance of the evidence in this case, that when Plaintiff's Exhibit No. 1, with Plaintiff's Exhibits No. 2 and No. 3 attached thereto, were handed to Mr. Lofthus, that it was the intention and understanding between the signers of the instrument and Mr. Lofthus, that it was to become effective at the time it was handed to Mr. Lofthus, and that if you further find that the Bank of Sanborn acted upon this instrument as a valid instrument, when the bank was opened for business on August 1st, 1921, then I charge you as a matter of law, that there was a delivery of the instrument within the meaning of the statute heretofore read to you.

"If on the other hand, Gentlemen of the Jury, you find from a preponderance of the evidence that Plaintiff's Exhibit No. 1, with Plaintiff's Exhibits No. 2 and No. 3 attached thereto, were handed to Mr. Lofthus with the understanding that he was to attach other papers to it before it became a binding instrument, if you find it was not com-

pleted when it was handed to him, and never was completed, then I charge you as a matter of law it never was delivered."

It will be noted that the trial court, during the introduction of evidence, expressed the view that he did not believe "the doctrine of estoppel could possibly apply to the question of the delivery." And the instructions seem to have been framed on the same theory. Under the instructions plaintiff could not prevail if the guaranty was delivered conditionally. In other words, if the jury believed that at the time the guaranty was executed and delivered to Lofthus there was an agreement as claimed by the defendants, they would be required to return a verdict for the defendants, even though they believed the testimony of Ritchie and the other directors as to what occurred at the directors' meeting held August 1st, 1921. In other words, under these instructions, the jury was precluded from making any finding on the question of estoppel. In our opinion the theory of the trial court was incorrect. The doctrine of estoppel is far reaching in its effects, and embraces almost every enterprise in which men may be engaged. 21 C. J. pp. 1117, 1118. It applies to rights of property, of contract, and of remedy. It may preclude a party from asserting title to his own property. And it may preclude one who is not bound by a valid contract from asserting that he is not so bound. And we are wholly satisfied that a guarantor who has delivered a guaranty conditionally, may become estopped from asserting such delivery as against one who, without notice of the condition, is induced by the conduct of the guarantor to believe that the guaranty is complete and effective, and acts and relies on such belief. 21 C. J. 927. See also 28 C. J. 915; 12 R. C. L. p. 1072. See also Spencer, Suretyship, § 44.

"Equitable estoppel," says Pomeroy (2 Pom. Eq. Jur. 4th ed. § 804), "is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

And "this estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally

or through culpable negligence induces another to believe certain facts exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." 21 C. J. pp. 1113, 1114, 1119; 2 Pom. Eq. Jur. 4th ed. § 805.

"Estoppel by silence arises where a person who by force of circumstances is under a duty to another to speak refrains from doing so and thereby leads the other to believe in the existence of a state of facts in reliance upon which he acts to his prejudice." 21 C. J. p. 1081.

"If any person, by a course of conduct, or by actual expressions, so conducts himself that another may reasonably infer the existence of an agreement or license, whether the party intends that he should do so or not, it has the effect that the party using that language, or who has so conducted himself, cannot afterwards gainsay the reasonable inference to be drawn from the words or conduct." Cornish v. Abington, 4 Hurlst. & N. 549, 157 Eng. Reprint, 956; 2 Pom. Eq. Jur. 4th ed. note p. 1647.

While the trial court was in error in assuming that the defendants could in no event be estopped from denying the delivery of the guaranty; and in instructing the jury on this theory, such error would not justify this court in ordering judgment notwithstanding the verdict. The ordering of such judgment is justified only if the evidence on the question of estoppel is such that reasonable men in the exercise of reason and judgment can reach only the one conclusion,—that the defendants are precluded from asserting that the guaranty was delivered conditionally only. In other words, judgment notwithstanding the verdict can be ordered only if it clearly appears, upon the whole record, that plaintiff is entitled to judgment as a matter of law. First State Bank v. Kelly, 30 N. D. 84, 152 N. W. 125, Ann. Cas. 1917D, 1044. And in our opinion that is the situation in this case. We believe the evidence in this case is such that reasonable men in the exercise of judgment and reason can reach only one conclusion—that the defendants are estopped from denying that the guaranty was delivered.

The question of such estoppel was made the basis of plaintiff's motion for a directed verdict and of the motion for judgment notwithstanding the verdict and the latter motion should have been granted.

The judgment and order appealed from are reversed and the cause remanded with directions to render judgment in favor of the plaintiff.

BURKE, BIRDZELL, NUESSLE, and JOHNSON, JJ., concur.