[File No. 6184.]

C. A. PETERSON, Respondent, v. L. R. BAIRD, as Receiver of the Security State Bank of Wildrose, Wildrose, North Dakota, Appellant.

(249 N. W. 690.)

Opinion filed July 17, 1933.

*Henry E. Johnson*, for appellant.

*Burdick & Burk*, for respondent.

BURR, J. During all the time involved the plaintiff was the president of the Security State Bank of Wildrose. On January 31, 1929, the bank closed because of insolvency, and defendant has been receiver ever since.

Plaintiff alleges that on December 20, 1928, at the solicitation of the cashier of the bank, he assigned to the bank his interest in a contract for deed for the sole purpose of restoring "the cash reserve of said bank and thus avoid the suspension of business" and for no other consideration; that said contract was not used to increase the cash reserve of the bank, but has been kept and retained by said bank; that before and after the closing of the bank he demanded the return of the contract and the defendant refuses to deliver the same; that the defendant collected payments due on said contract and refuses to turn this money over to the plaintiff.

The complaint alleges that this contract "was assigned . . . . and

. . . delivered only for the purpose of securing a loan of funds for said bank . . . to be used in increasing the depleted cash reserve . . . that no loan was made by said bank on said securities. . . ." This is specifically denied by the answer, but the defendant admits the contract was assigned to the bank and he collected payments, but alleges that the said contract came into the possession of the Security State Bank of Wildrose and was a part of the assets of the said bank at the time that it became insolvent; that this answering defendant is now administering the said contract as a part of the assets of the said closed Security State Bank of Wildrose, and is entitled to seek performance of said contract.

The trial court found that the contract was assigned for the "sole and only purpose of enabling said bank to borrow additional funds . . . and by reason of the fact that said bank has never used said contract for the purpose for which it was given, . . . Peterson is entitled to have the assignment of said contract . . . cancelled and annulled. . . ." Judgment was entered for plaintiff accordingly and the defendant appeals demanding a trial de novo.

On December 19th, 1928 a deputy bank examiner, checking over the affairs of this bank, found carried as assets real estate valued at $7,600 and held by the bank longer than the statutory five years; (§ 5152 of the Comp. Laws) and over $12,400 in poor paper valued by him at $4,400, and that the reserve, which should have been $19,409, had fallen to $9,103. He showed this to the cashier—the one having general charge and management of the bank, a stockholder, but not a director—and that evening had a conference with the plaintiff, and other directors. He told them prior thereto he had called their attention to the real estate and the paper, and required them to remove the excessive real estate, take out the poor paper and raise the reserve, stating that something must be done otherwise the bank would be closed. A director testified that they asked him if they could put in directors' notes and he told them they had enough of notes now, (the plaintiff and other officers already owed the bank more than $5,000) that they would have to get up the cash reserve or the bank would close, and criticized them for having the real estate in the bank.

Plaintiff says: the examiner left the conference and the cashier asked him to assign this contract to the bank; that he did so upon the

express agreement and understanding it should be used for the purpose of raising money to increase the reserve, for no other purpose, and that "they did not borrow any money." In this he is corroborated by two witnesses. The cashier did not testify and the record does not explain why he was not called.

Johnson, a director, was asked: "Was this paper put in the bank to meet those demands of the bank examiner, and was it put into the bank in compliance with his demands?" and answered "Put into the bank, part of it in compliance. We could not meet up with all of his demands." He said it was given to raise the reserve and when asked: "Well do you know whether or not the reserve in the bank was bolstered up right after this contract and notes were executed?" answered: "No, I understand it was not, didn't use the paper for that purpose . . . all I know is according to the statement of the bank." He testified that the directors wanted to keep the bank open and protect the depositors; that after the assignment was made he heard it advertised in the community that the contract had been turned over.

The plaintiff, another director, and a collector for the bank a stock-holder, drove to Williston where they consulted a lawyer. There the contract was assigned and turned over to the collector who delivered it to the cashier. The cashier immediately removed from the assets shown on the books of the bank a quarter section of land which had been held by the bank for seven years, was valued at $4,000 less prior incumbrance of $1,500 and carried as worth $2,000. He substituted this contract—carrying the removed real estate as a non-ledger asset.

Mr. Van Sickle, who took charge of the bank when it was closed, testified: that, he came there at the time it was closed, found this contract listed as an asset, the cashier told him that it belonged to the bank; that about four, five or six months prior to the trial of the case in the district court the plaintiff asked him if there was "any reason why I could not return it"—the contract—and this was the first time he approached him in regard to a return.

The records show that the cash reserve of the bank was $9,209.80 on the 18th of December and on the 24th of December had risen to $15,-667.81; that on December 18th, 1928, individual deposits subject to check amounted to $63,891, time certificates of deposit to $54,362, and outstanding cashier's checks to $653. On December 24th these items

had risen to $66,459, $55,593, and $1,204, respectively.

We are not unmindful of the weight to be given to the findings of the trial court, as set forth in Doyle v. Doyle, 52 N. D. 380, 388, 202 N. W. 860, though as pointed out in Andersen v. Resler, 57 N. D. 655, 665, 223 N. W. 707, the findings in a case triable de novo in this court are not entitled to the same weight as the findings of the court in a case properly triable to a jury but where a jury is waived.

The record shows the assignment is in writing. It was not introduced in evidence. There is nothing in the record showing that the assignment is limited to the specific alleged purpose nor is it so argued nor claimed.

Plaintiff was president of the bank and as such official he was required to keep accurately informed as to its condition. He admits he took no part in the management of the affairs of the bank. In this he violated the statute. He had to be one of the directors before he could be president. Comp. Laws, § 5150, subd. 5. His duties as defined by the Board of Directors are not shown; but under the statute (§ 5164) he was required to take an oath that he would "so far as the duty devolves upon him, diligently and honestly administer the affairs" of the bank. There being nothing in the record contrary we assume he complied with this requirement. As an officer of the bank he was required to "furnish a good and sufficient bond" before entering upon his duties as president (§ 5181 Comp. Laws) but the record shows none was given. Apparently he was not familiar with the condition of affairs except in a very general manner. He testified the bank was closed three days before he knew it.

Whatever he may have actually known of the condition of the bank prior to December 19, 1928, on that day he knew the bank was insolvent for it was made known to him by the bank examiner in plain terms that the reserve funds of the bank was less than fifty per cent. of what was required by the statute. Section 5180 of the Supp. requires a bank at all times to "have on hand in available funds an amount which was equal to twenty per cent. of its demand deposits and amounts due to other banks, and ten per cent. of its time deposits." On the day stated this bank therefore was required to have a reserve fund of $19,490.00 whereas the books of the bank show the reserve fund was but $9,108.00. Under the statute, Section 5189 of the Supp.,

"a bank shall be deemed insolvent; . . . III, when it shall fail to make good its reserve fund as required by law; . . ."

So far as the bank is concerned the instrument came into its possession for the general purpose required by the bank examiner and was so used. It is useless for the plaintiff to allege he received no consideration. As the president and director of the bank he owed a duty to the depositors and by means of this instrument, and for other reasons, the bank continued for six weeks. This was sufficient consideration. That the plaintiff would seek to avoid if possible the double liability on his stock by keeping the bank open cannot be overlooked.

Plaintiff knew the reserve was $10,000.00 short and he well knew such an amount could not be obtained on this assignment. There is no showing in the record in the trial of this case of any other securities being delivered for this purpose though there is a hint thereof. Consequently the plaintiff must be held to know that the insolvency of the bank could not be corrected by this assignment alone. As president he permitted the bank to remain open while insolvent and the record shows it received thousands of dollars thereafter. No banking association is permitted to "accept or receive on deposit with or without interest any money, . . . when such banking association is insolvent." Comp. Laws, § 5175. Any officer or director who permits or is accessory to the receiving of any such money on deposit when the bank is insolvent is guilty of a felony. Comp. Laws, § 5176.

The plaintiff himself shows he delivered the assignment to the collector who gave it to the cashier. He never inquired of the cashier or any one else what became of his contract; he never asked whether money had been raised on it; apparently he never examined the records of the bank of which he was president; six weeks went by before the bank closed, and he showed no interest in the fate of the contract. It was not until two years and a half had expired, and the bank for that time had been under the care of the defendant that he asked if he had anything coming on the contract. It is significant that almost immediately after the delivery the deposits in the bank—those subject to check and those on certificates—increased substantially, as did also the reserve that was carried. Whatever may have been the secret purpose the assignment was entered as an asset of the bank. That the cashier may have violated his agreement with the president is of no moment so

far as the defendant and those he represents are concerned. The plaintiff owed a duty to the public and particularly to those with whom he dealt. It is no excuse to say he left the management to the cashier. He knew what the demands of the examiner were and he admits he attempted to comply with one of them.

It is true that the record does not show a deliberate attempt to deceive the examiner but those dealing with the bank itself have a right to depend upon its own books and records showing its statement of assets and liabilities. As stated in Vallely v. Devaney, 49 N. D. 1107, 1116, 194 N. W. 903:

"Banks are institutions subject to public regulation to the end that they may make proper loans and freely contract debts with depositors and others to achieve the ends of legitimate business. Careful examinations by public authority are required periodically in order that those who deal with banks may not be misled by appearances."

As stated in 3 R. C. L. 495, "For an insolvent banker, company, or corporation to continue the business of banking is to hold out assurances of responsibility and surplus capital where neither exists. To do so knowingly is to secure the confidence, and hence obtain, the money, of the ignorant and unwary by an implied deception."

It is not necessary to prove vicious motive. The record shows the plaintiff grossly negligent in the discharge of his duties as director and president of the bank and even if he was a victim of misplaced confidence in the cashier he is answerable for this error and for his negligence to the public in permitting this entry to be made and thus impliedly deceive the clients and customers who dealt with the bank because continuing to remain open, and continuing to solicit and obtain business.

It is true the record shows that the tract of land taken from the assets and carried as a non-ledger asset remained in the control of the receiver, who farmed it and from sources other than those derived from the land itself paid taxes and the mortgage thereon. In the trial of the case it was urged that the receiver holds both the land that was taken out and this contract and the query was advanced what does Mr. Peterson get? He gets nothing from the bank and under the circumstances shown he is entitled to nothing from it. He did not trade his contract for any land. Even if given to comply with a general demand

he does not claim there was any agreement to transfer land to him. His assignment was in addition to what the bank already had. Poor paper and excessive real estate could be taken from the actual live assets of the bank as shown by the books, and still remain the property of the bank. That was the situation here.

When we consider the admitted demands of the examiner, the giving of the assignment, the entry of the same on the books of the bank as an asset, the action of the cashier in substituting this in lieu of objectionable real estate, the failure of the plaintiff to question this although president of the bank and with full opportunity to examine its records, the fact the bank was permitted to remain open for six weeks, that the plaintiff made no inquiry for two and one half years thereafter, we are led, almost irresistibly, to the conclusion that the assignment was given to the bank to comply with the demands in general and not with a specific demand.

Plaintiff says the cashier, in violation of his agreement, made an entry on the books of the bank to the effect that it was an asset in lieu of real estate taken out. This, in fact, is charging the cashier with making a false entry; for any entry intentionally made to represent what is not true is a false entry. United States v. Allis (C. C.) 73 Fed. 165, result affirmed in 155 U. S. 117, 39 L. ed. 91, 15 S. Ct. 36. If this entry were made with the intention to deceive any one authorized to examine as to the condition of the bank it was a crime. Supp. § 5174. Thus, the cashier intentionally made a false entry or he did not understand the assignment was given for a limited purpose. We presume no one intentionally commits a crime and that no officer intentionally makes a false entry. Thus the action of the cashier adds persuasive force to the theory that the assignment was in fact given in an attempt to comply with the general demands of the examiner.

In addition we cannot overlook the fact that the record shows that the only amount that was due on that contract at that time was the sum of five hundred dollars payable in November 1929. A consideration of the fact that though the cash reserve was $10,000.00 below the statutory requirements there is nothing in the record to show attempt made to pledge the contract for the raising of money adds force to the theory that the assignment was made to comply with the demands in general.

There are elements of equitable estoppel here. A person by his voluntary conduct may be absolutely precluded "from asserting rights which might perhaps have otherwise existed, either of property, of contract or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract or of remedy." 2 Pom. Eq. Jur. 4th ed. § 804.

This estoppel arises when one, silent "when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." 21 C. J. 1113.

Estoppel by silence arises when a person under duty to speak out, refrains from so doing and leads another to believe in the existence of the facts upon which he is relying. 21 C. J. 1081; Baird v. Stephan, 52 N. D. 568, 204 N. W. 188.

As we have pointed out the plaintiff made no inquiry as to the use to which the instrument was put; never examined the books and permitted the bank to go into the hands of the receiver and for two and a half years thereafter was silent as to any claim of his.

Whatever may have been the true agreement with the cashier the plaintiff cannot be permitted to say now that this assignment was not a general asset of the bank.

The receiver represents the creditors of the bank as well as the stockholders and in his capacity as representative of the creditors he occupies a position necessarily at variance with interests of the plaintiff his co-director and the stockholders as against the creditors. In view of the whole situation disclosed by the case the plaintiff is estopped from denying as against the representative of the creditors that this assignment was given as a general asset. This being so he is not entitled to the return of the same nor to any of the sums collected thereon. The judgment of the lower court is reversed and judgment entered for the defendant.

NUESSLE, Ch. J. and CHRISTIANSON, BIRDZELL and BURKE, JJ., concur.