Lena FRANDSON, Plaintiff and Appellant,

v.

M. S. CASEY; the unknown heirs of Anna M. Beatz, deceased; Naomi Stenzel; Oralie Lorenz; Helen Jackson; Howard Hudson; Myrtle Hudson; the unknown heirs of George W. Hudson, deceased; State Bank of Ross, North Dakota, a corporation; Joseph Langer; F. H. Gaulke; the unknown heirs of Agnes A. Wood, deceased; T. T. Lode; Roy E. Muck; the unknown heirs of Mary E. Muck, deceased; Louisa Muck; Gerald Muck; Doris Muck; the unknown heirs of James F. Muck, deceased; the unknown heirs of J. E. Smith, deceased; and all other persons unknown claiming any estate, or interest in, or lien, or encumbrance upon the land described in the complaint whether as heirs, devisees, legatees, or personal representatives of Anna M. Beatz, deceased; George W. Hudson, deceased; Agnes A. Wood, deceased; Mary E. Muck, deceased; James F. Muck, deceased; and J. E. Smith, deceased; or otherwise, Defendants,

and

Howard Hudson, Myrtle Hudson, Oralie Lorenz, Naomi Stenzel and Helen Jackson, Defendants and Respondents.

No. 7523.

Supreme Court of North Dakota.

Dec. 5, 1955.

Rehearing Denied Dec. 19, 1955.

438

Q. R. Schulte, Stanley, for plaintiff and appellant.

C. D. Aaker, Minot, for defendants and respondents.

JOHNSON, Judge.

This is an action to quiet title to land located in Mountrail County, North Dakota. The action covers 320 acres. Only the title to 160 acres, however, is in dispute, to wit: The South Half of the Northeast Quarter (S½NE¼) and the North Half of the Southeast Quarter (N½SE¼) of Section 14–154–93. The plaintiff claims to be the owner thereof. The defendants, Naomi Stenzel, Oralie Lorenz, Helen Jackson, Howard Hudson, and Myrtle Hudson, also claim to be the owners thereof and assert their title thereto. They ask immediate possession thereof upon payment of taxes that have been levied against the premises; that the quitclaim deed from Myrtle Hudson on which the plaintiff bases her title be declared null and void and of no force and effect, and that the plaintiff render an accounting of the use and occupancy of the premises.

The facts out of which this controversy arises are as follows: At the time of the death of George W. Hudson, on December 7, 1932, he was the record owner of the above described land. On May 26, 1938, Mountrail County acquired a valid tax title thereto. The county was in possession of the property from the time it took title until in May of 1943. On April 14, 1943, at private sale, the county sold the land to Hans Frandson for $284 with a down payment of $71. On the 15th day of April 1943 the county mailed a "notice of right to redeem" addressed to George W. Hudson, Forada, Minnesota, his address, advising that the county had sold the land to Hans Frandson and:

"that this sale will become final at the expiration of 30 days from the date of mailing this notice, unless within said time you make redemption by paying the full amount of delinquent taxes, penalty and interest charged against said real estate, during which 30 day period the said sale will be held in abeyance."

The notice further advised that the amount required to make redemption amounted to $253.68. This notice was received by

Myrtle Hudson, the widow of George W. Hudson. The land had been sold by him to James F. Muck on a crop contract and a similar notice was mailed to Muck at Ross, North Dakota. Shortly after the mailing of this 30 day notice, John H. Jackson, a son-in-law of George W. Hudson and Myrtle Hudson, the widow of George W. Hudson, wrote a note to the county auditor at the bottom of the notice of the right to redeem. It stated:

"Enclosed find check to cover redemption in the amount of $253.68. Kindly mail receipt to Myrtle Hudson, Forada, Minnesota."

On May 24, 1943, the county executed a deed to George W. Hudson. On May 14th the county auditor of Mountrail County wrote a letter to Hans Frandson returning to him his check for $71 left as a down payment on the land. In his letter the county auditor said:

"This land was redeemed by the former owner, George W. Hudson."

In the tax deed records of the county someone wrote:

"Redeemed by George W. Hudson, 253.68."

George W. Hudson left surviving him as his sole heirs his widow, Myrtle Hudson, three daughters, Oralie Lorenz, Naomi Stenzel and Helen Jackson, and a son, Howard Hudson. George W. Hudson's estate was probated in the State of Minnesota and a decree of descent was issued by the judge of probate of Douglas County to property left by the deceased in the State of Minnesota.

Under the statute of succession of our state, Section 56–0104, NDRC 1943, upon the death of George W. Hudson, his widow succeeded to a one-third interest in the land owned by him in North Dakota and the other answering defendants, his son and daughters, succeeded to a two-thirds interest therein, or a one-fourth interest in the two-thirds interest, or one-sixth interest therein to each. Hans Frandson was apparently interested in obtaining title to this land as evidenced by his offer to purchase the same from the county and the down payment thereon. Sometime in the spring of 1943 it appears that Hans Frandson, or someone on his behalf, wrote concerning this land. On May 15, John H. Jackson wrote a letter to Hans Frandson advising that he had sent a check to the county treasurer of Mountrail County "redeeming the George (H.) Hudson quarter section of land." He also said:

"Inasmuch as you were also interested in the land I thought I would give you first chance to either buy or rent it."

He asked for a reply. At the bottom of this letter appears a postscript written in ink:

"Mr. George Hudson was my father-in-law and I redeemed the land for the George Hudson estate."

Subsequent to this letter considerable correspondence developed between Jackson and Frandson concerning the rental or purchase of the land by Hans Frandson. In a letter dated March 23, 1944, by John H. Jackson, he stated:

"As you know, I bought this farm for the taxes that were against it. Obviously, I don't care to sell it at this time without making some profit."

In another letter dated April 6, 1944, John Jackson again reiterates:

"I did not care to sell for the price you offered to pay for it."

It will be noted that in these letters, apparently John H. Jackson talks in terms of owning the land himself. Early in May of 1945, Hans Frandson and John H. Jackson had agreed to the terms of purchase, and John H. Jackson sent to the bank of Sanish, Sanish, North Dakota, two deeds, one from Mountrail County to Myrtle Hudson and one from Myrtle Hudson to Hans Frandson. These deeds appear in evidence.

It will be remembered that upon the original redemption or repurchase of the land

from Mountrail County on May 24, 1943, the county issued a deed designated as "County Deed—From County to Purchaser" to George W. Hudson. This deed was never recorded. On April 3, 1945, Mountrail County issued another deed to the land involved to Myrtle Hudson. The deed to George W. Hudson was apparently surrendered, and at the time of the trial of this action in district court was found in the office of the county auditor. On the face of this deed appears the following in pencil:

"This deed cancelled 4–5–45. New deed issued to Myrtle Hudson, wife of George W. Hudson."

On April 26, 1945, Myrtle Hudson by quitclaim deed purports to convey *all* of the South Half of the Northeast Quarter (S½NE¼) and the North Half of the Southeast Quarter (N½SE¼) Section 14–154–93 to Hans Frandson. This deed, together with the county deed, was forwarded to the bank of Sanish for delivery to Hans Frandson upon payment of the consideration agreed upon. Both deeds were recorded in the office of the register of deeds on the 11th day of May 1945, apparently by Hans Frandson, as each deed contains a notation of his name and the amount paid for the recording and his address at Ross, North Dakota.

Hans Frandson died in November 1946 and his estate was probated and decreed to his widow, Lena Frandson. She brought this action to quiet the title to the property.

The trial court determined that Lena Frandson owned a one-third interest in the property, having acquired only that interest which Myrtle Hudson acquired upon the redemption or repurchase, and that the defendants, Naomi Stenzel, Oralie Lorenz, Helen Jackson and Howard Hudson, the children of George W. Hudson, deceased, owned a two-thirds interest in the land. It further determined that the plaintiff and the children of George W. Hudson were the owners of the land as tenants in common. The plaintiff appealed and demands a trial anew in this court.

After the completion of the trial of this action and after the trial court had written its memorandum decision, a copy of which was sent to the State's Attorney of Mountrail County, application was made by the county to intervene in the action. This application is dated August 31, 1954. The pleadings in intervention of the county are dated the same day. On the 2nd day of September 1954, an order was entered allowing intervention. The findings of fact, conclusions of law and order for judgment were signed by the trial court two days before the order allowing intervention. Judgment, however, was not entered in the action until October 1, 1954.

■ Intervention in an action may be had upon timely application before trial by any one who has an interest in the subject matter of the litigation or in the success of either party, or an interest against both parties to an action or proceeding. Section 28–0219, NDRC 1943.

■ In the case of First National Bank & Trust Co. v. Stonehouse, 67 N.D. 11, 15, 269 N.W. 51, 53, it was held that intervention cannot be had after a matter is settled. Intervention is only permitted before trial.

The validity of the tax title acquired by Mountrail County is not questioned.

■ The title acquired by the county was a new and complete title in the land, under an independent grant from the sovereign authority which bars and extinguishes all prior titles and encumbrances of private persons whether of record or otherwise. Baird v. Stubbins, 58 N.D. 351, 226 N.W. 529, 65 A.L.R. 1009; Ulrich v. Amerada Petroleum Corp., N.D., 66 N.W. 2d 397. This title, therefore, extinguished all prior titles and encumbrances and left to the former owners, who held title as tenants in common, Myrtle Hudson, Naomi Stenzel, Oralie Lorenz, Helen Jackson and Howard Hudson, the privilege of redeeming or repurchasing the property as long as the title thereto remained in the county. Sections 57–2818, NDRC 1943 and 57–2819, NDRC 1953 Supp. We need not determine

whether a redemption or a repurchase took place. The result is the same in either case. The same parties under either statute have the right to redeem or repurchase real estate forfeited to the county under tax deed. Upon the acquisition of absolute title in fee by Mountrail County the tenancy in common of the heirs of George W. Hudson was terminated. Baird v. Stubbins, supra, Ulrich v. Amerada Petroleum Corp., supra.

█ The validity of the redemption or repurchase of the land by one or all of the heirs of George W. Hudson cannot be questioned. The thirty day notice was addressed to him as the title owner at his address. It was received by his widow. Redemption or repurchase was made. Neither do we need to concern ourselves with the possible validity or invalidity of the original deed given by the county upon the redemption or repurchase of the land in which George W. Hudson, then deceased, was named as grantee. His heirs, immediately upon his death, became the owners of the real property in his name and the descent of the title to the property by operation of law created in them a tenancy in common. Stevahn v. Meidinger, N.D., 57 N.W.2d 1; Ellison v. Strandback, N.D., 62 N.W.2d 95; Section 56–0104, subd. 1, par. b, NDRC 1943. But the question still remains whether the redemption or repurchase inured solely to the benefit of Myrtle Hudson or to her and her son and three daughters.

Although John H. Jackson, the son-in-law of George W. Hudson, deceased, asserts that he actually made the redemption or repurchase and was acquiring the property for himself, it is clear that he had no right of redemption or repurchase. He does not come within the terms of either Section 57–2818, NDRC 1943 or 57–2819, NDRC 1953 Supp. He did furnish the money for the redemption or repurchase. But in order to accomplish the redemption or repurchase it had to be made either by all the heirs of George W. Hudson as the members of his immediate family or by one or more of them. Jackson apparently realized this and after the negotiations with Hans Frandson the quitclaim deed to him

runs from Myrtle Hudson, the widow of George W. Hudson, deceased.

It is manifest from the evidence that it was the understanding of the county auditor that the redemption or repurchase was being made by George W. Hudson. The first county deed, dated May 24, 1943, was issued to George W. Hudson. The tax deed record in the county auditor's office contains a notation that the property was redeemed by George W. Hudson. The notation of the cancellation of this deed under date of April 5, 1945, contains the statement that the new deed was issued to Myrtle Hudson, wife of George W. Hudson.

The money forwarded to the county to effect the redemption or repurchase came from John H. Jackson. It did not come from Myrtle Hudson. However, he directed the receipt to be issued to Myrtle Hudson. It will be noted that at about the time that the negotiations with Hans Frandson for the purchase of the land were consummated, the first deed was canceled and a new one issued to Myrtle Hudson. In the first correspondence with Hans Frandson, John H. Jackson referred to redeeming the George (H.) Hudson quarter, and in a postscript definitely states that he was his father-in-law, and that he, John Jackson, redeemed the land for the *George Hudson estate.* It is true that in subsequent correspondence Jackson emphasizes that he bought the land, but that does not alter the fact that when the money was sent to the county auditor it was to redeem or repurchase a title that had been in all the heirs of George W. Hudson, and if the redemption or repurchase had the effect of restoring the title taken and forfeited to the county either by redemption or repurchase to its previous status, it reverted to all of them. The facts would seem to bear that out.

*Myrtle Hudson at no time asserts her sole* right to redeem or repurchase. She apparently did nothing except to acquiesce in what was being done by John H. Jackson. In his testimony he admits that Myrtle Hudson and Helen Jackson were the only

ones that knew what he was doing. The other heirs knew nothing about the redemption or repurchase. They were not aware of any negotiations of sale to Frandson. The service of the summons and complaint by Lena Frandson apparently was the first notice that Naomi Stenzel, Oralie Lorenz and Howard Hudson had of any controversy concerning the title to the property. Although finding No. 4 of the trial court states in part:

> "That the deed to George W. Hudson, deceased, upon request of John H. Jackson, was canceled on April 5, 1945 by the County Auditor and a new deed issued to said widow, Myrtle Hudson in 1945,"

there is nothing in the record to show such request. But it is clear that apparently during the negotiations between Hans Frandson and John H. Jackson, it became evident that title to the land could not be delivered to Hans Frandson because the George W. Hudson estate had not been probated in North Dakota. Obviously to avoid the necessity of such probate, the former deed was canceled and a new deed issued to Myrtle Hudson, who purports to convey the entire quarter section of land as the full and complete owner thereof to Hans Frandson. It is also clear that if, upon the redemption or repurchase, the title to the land accrued to all of the heirs of George W. Hudson, the mere cancellation of the deed of George W. Hudson neither added to nor detracted from their title. There was no legal authority in the county auditor to cancel the deed. Its cancellation did not change the legal situation. At any rate if the heirs of George W. Hudson, as tenants in common, upon the redemption or repurchase, became the owners of the property, there was no legal method by which the entire title could be transferred or vested in Myrtle Hudson except by probate of the George W. Hudson estate, and upon title being vested in all of the heirs thereby, a deed from them to her.

John H. Jackson testified by deposition. He was asked:

"Q. Did you, after the decease of George W. Hudson, deceased, redeem the said real estate for Myrtle Hudson; do you recall the date of this redemption? A. Well, I redeemed the real estate mentioned in the question, *but not necessarily for Myrtle Hudson.* I had some money, and I didn't want to see the land go by default for taxes. Myrtle Hudson knew I was paying the taxes and redeeming the land, and so did my wife, Helen Jackson, know I was doing this. I used my own money in redeeming the land, and I do recall the date of the redemption." (Emphasis supplied.)

"Q. Were you acting as agent for Myrtle Hudson? Did the other heirs of George W. Hudson, deceased, namely Oralie Lorenz, Helen Jackson, Howard Hudson, and Naomi Stenzel consent to such redemption? A. Well, as I stated, I was *not necessarily the agent for Myrtle Hudson or any other person in redeeming the land.* The money that was used was my money, and I redeemed the land because I hated to see it go for taxes. And in answer to the second part of the question I want to state emphatically that Oralie Lorenz did not consent to such redemption by me, because, well, she knew nothing about it; and Howard Hudson did not consent because he knew nothing about it; and Naomi Stenzel did not consent because she knew nothing about it. (Emphasis supplied.)

"Q. After redeeming said land, did you act as agent and sell the land to Hans Frandson? For whom did you act as agent? A. Well, in selling the land I was acting for myself, although I had to use my mother-in-law's name on the deed, that is Myrtle Hudson. I sold the land and delivered a deed by Myrtle Hudson, but the money received was my money, and no one else shared in it. This money was paid by Hans Frandson, and I kept all of it."

■ Since John H. Jackson possessed no privilege of redemption or repurchase, and since the record shows, and he disclaims, he was doing this for Myrtle Hudson or as her agent, and since it further shows that she did absolutely nothing about redeeming or repurchasing the property, the legal effect of the redemption or repurchase resulted in vesting the title to the land in all of the heirs of George W. Hudson, as was stated by Jackson in his letter to Frandson, "I redeemed the land for the George Hudson estate." What he claimed thereafter cannot alter the situation.

■ The courts agree that it would ordinarily be inequitable, because of the confidential relationship existing between cotenants, to permit one without the consent of the others to buy an outstanding adversary title or claim and assert it for his exclusive benefit. And when such a transaction comes before the courts they will usually regard the purchasing tenant as holding the title or claim so acquired for the benefit of his cotenants upon seasonable contribution by them of their respective proportions of the necessary expenditure. 14 Am.Jur., Cotenancy, Sec. 51, p. 120. See note 13 for citations of cases; Stevahn v. Meidinger, N.D., 57 N.W.2d 1, 12. In that case this court said:

"If one of them [cotenants] buys it he does so subject to the rights of the others to contribute to the purchase price and participate in the benefits. 14 Am.Jur., Sec. 53, p. 123. This principle is applicable where one of several co-owners of property acquires a tax title to the property or bids the same in at a judicial or foreclosure sale. 14 Am.Jur., Sections 54 and 55, pp. 123–126."

There are some limitations upon this rule, as where there is in fact no confidential relation between the cotenants, or their interests accrued by different acts or under different instruments. See 14 Am.Jur., Cotenancy, Sec. 52, p. 122:

The general rule has been stated as follows:

"Tenants in common and joint tenants are said to stand in confidential relations to each other in respect to their interests in the common property and the common title under which they hold; and the courts generally assert that it would be inequitable to permit one, without the consent of the others, to buy in an outstanding adversary claim to the common estate and assert it for his exclusive benefit to the injury or prejudice of his co-owners; and, if one cotenant actually does acquire such claim, he is regarded as holding it in trust for the benefit of all his cotenants, in proportion to their respective interests in the common property, who seasonably contribute their share of his necessary expenditures; the courts will not, ordinarily, permit one cotenant to acquire and set up for his exclusive benefit any claim adverse to the common rights; at least, where all the cotenants *derive title from a common ancestor by descent, or from a common grantor by a single conveyance.*" 54 A.L.R. 75. See citation of cases in this note supporting this statement of the rule. (Emphasis supplied.)

In the case of Arthur v. Coyne, 32 Okl. 527, 122 P. 688, it was held that where each of two persons owns an undivided half interest in the improvements on and the right of possssion to a town lot, and are, as such, cotenants entitled to have it scheduled to them jointly and to purchase it under the town-site law, and one of them, without the knowledge or consent of the other, has the lot scheduled to and acquires the legal title in himself individually, he will be held to take the legal title of the interest of his cotenant as trustee.

■ Here the title to the heirs of George W. Hudson came to them by operation of law on his death. If Myrtle Hudson were now permitted, merely by virtue of the deed issued to her in cancellation of the one issued to her deceased husband, to acquire the entire fee to the land, she would be acquiring an inequitable advantage

over her cotenants. The new cotenancy did not come about by the issuance of the county deed to George W. Hudson. Upon the acceptance by the county of the amount necessary to redeem or repurchase the property the county no longer had any interest therein. The issuance of a deed to evidence that fact is a mere clerical duty. In the case of Buman v. Sturn, 73 N.D. 561, 16 N.W.2d 837, it was held that upon the expiration of the period of redemption the county was vested with absolute title and it was but a ministerial act upon the part of the county auditor to issue the deed. See also Stutsman v. Smith, 73 N.D. 664, 18 N.W.2d 639. It was likewise held that upon the running of the period of redemption in a mortgage foreclosure the title to the property vests in the holder of the sheriff's certificate. First National Bank v. Knauss, 68 N.D. 227, 277 N.W. 516. See also Lillegard v. Hutchinson, 67 N.D. 44, 269 N.W. 43. In Stevahn v. Meidinger, N.D., 57 N.W.2d 1, 17, it was held that the right of redemption can only be exercised within the period of time and in the manner prescribed by law, thereby implying that title vests upon the expiration of the time to redeem. 59 C.J.S., Mortgages, § 772b, page 1456. While the situation here is not exactly the same, it is analogous. The redemption or repurchase placed all the cotenants in the position they were before the tax title. They became vested with all the right, title and interest of the county in the land. It was but a ministerial act to execute the deed. The county, apparently without knowledge of the death of George W. Hudson, executed the deed to him. Thus the title remained for nearly two years. No one made any objection. It is only when a sale was about to be completed to Hans Frandson that there is an attempt to change the legal consequences accruing upon the redemption or repurchase of the land. The cotenants here were a mother and her children. There is every reason to adhere to the rule that it would be inequitable to permit one by reason of the confidential relationship existing between them to procure an adverse title to the property for her exclusive benefit without the knowledge of the other cotenants in absence of a waiver of their right. No such waiver exists here.

Here the redemption or repurchase amounted to the procurement by the former owners of the tax title acquired by the county upon tax forfeiture. Under the facts and circumstances involved in the redemption or repurchase of the property from the county accruing by virtue of the redemption or repurchase privilege, the title thereto inured to the benefit of all the heirs of George W. Hudson as tenants in common. The redemption or repurchase resulted in the creation of a new tenancy in common in the heirs of George W. Hudson and they then were entitled to the possession of the property.

It is argued that the land was abandoned by George W. Hudson during his lifetime. This contention is wholly immaterial, as the former owner, his executor or administrator, or any member of his immediate family, had the right to redeem or repurchase the real property forfeited to the county under tax deed proceedings so long as the tax title thereto remained in the county. Upon notice of the sale of the property to Hans Frandson by the county, and within the time of the thirty day notice, the privilege extended by the statute was utilized and a redemption or repurchase was made. We have held that the legal effect of such redemption or repurchase was to reinvest the forfeited title in the heirs of George W. Hudson, deceased.

It is also contended that the answering defendants are barred from asserting title to the land by the operation of an equitable estoppel. The attempt to invoke this doctrine is based on the fact that Hans Frandson relied on the statements made by John H. Jackson when purchasing the land. Frandson wanted the land. He had purchased it from the county and his agreement of purchase was canceled as soon as John H. Jackson, the son-in-law of George W. Hudson, sent the amount stated in the "notice of right to redeem" to the county and the county issued a deed to George. W. Hudson. Mr. Frandson negotiated for

nearly two years with John H. Jackson. He, of course, was aware of the forfeiture of the land to the county by virtue of his dealings with the county for its purchase. He obtained a quitclaim deed from Myrtle Hudson. That deed conveyed to him only such title as Myrtle Hudson had. Mr. Frandson, being fully aware of the condition of the title, had no right to rely upon any facts or statements of John H. Jackson. Nor does the record indicate that any representations were made by John H. Jackson as to ownership by Myrtle Hudson of the complete title which she purported to convey by her quitclaim deed to Frandson. It is a proper inference to conclude, although the record does not show it, that Mr. Frandson was aware of the necessity of getting the title out of the name of George W. Hudson so that a conveyance could be made to him without a probate of his estate. While there is nothing in the record to indicate by whose procurement the original county deed was canceled, it does appear that it was canceled on April 5, 1945, two days after the new deed had been issued to Myrtle Hudson and the deed to George W. Hudson had been surrendered, and within twenty-one days thereafter Myrtle Hudson quitclaims to Frandson.

"The facts in this case fall far short of establishing an equitable estoppel. An essential element of such an estoppel is a representation which may consist of words, acts or silence, believed and relied upon by the party claiming the benefit of the estoppel which induced him to act or refrain from acting, to his prejudice. Thompson on Real Property, Perm.Ed., Sec. 2612; Pomeroy's Equity Jur., 5th Ed., Sec. 812. In the latter citation it is said:

"'The cases all agree that there can be no estoppel, unless the party who alleges it relied upon the representation, was induced to act by it, and thus relying and induced, did take some action. * * * Although this action is usually affirmative, yet such affirmative action is not indispensable. It is enough if the party has been induced to refrain from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss.'" Werner v. Werner, 74 N.D. 565, 571, 23 N.W.2d 757, 759. See also Baird v. Stephan, 52 N.D. 568, 204 N.W. 188.

■ There is not the slightest intimation in the record that anything that Jackson said or did was in any way relied upon by Hans Frandson. He was acting on his knowledge of the whole situation, and if he did not take the precaution to ascertain the exact legal status of the state of the title prior to his purchase, he had no one to blame but himself, and his widow, who inherited from him, stands in no better position than he did. Even if we assume that Mr. Frandson was ignorant of the legal effect of the quitclaim deed from Myrtle Hudson, such ignorance was not induced by any act of John H. Jackson or Mrs. Hudson.

■ It is next asserted that the answering defendants are barred from asserting title by laches. Laches, generally speaking, is such a delay in enforcing one's right as to work a disadvantage to another. In a sense it is neglect for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done. 30 C.J.S., Equity, IV. Laches, etc., § 112, p. 520. In Gronna v. Goldammer, 26 N.D. 122, 134, 143 N.W. 394, 398, this court said:

"In order, indeed, 'that a remedy may become barred because of laches, there must appear, in addition to mere lapse of time, some circumstances from which the defendant or some other person may be prejudiced, or there must be such lapse of time that it may be reasonably supposed that such prejudice will occur if the remedy is allowed.'"

The essential elements of laches are set forth in 19 Am.Jur., Equity, Sec. 498, pp. 343 and 344.

No ironclad rule can be laid down applicable to all cases, but the circumstances of each case must determine the application of laches as the equities are shown by the evidence. No argument is presented by the appellant to show the proper application of laches as to the rights that she asserts in this action. No act or representation is pointed out of the answering defendants which in any way misled the plaintiff and appellant. In fact the evidence discloses that her husband, Hans Frandson, did not deal at all with the answering defendants. He dealt with John H. Jackson, who testified that none of the defendants except his mother-in-law, Myrtle Hudson, and his wife, Helen Jackson, knew about the redemption or repurchase of the land or its sale. He disclaims that he was acting for Myrtle Hudson or as her agent. He asserts that he was acting for himself. Hans Frandson knew, or must have known, that the original record ownership existed in George W. Hudson. He knew, or must have known, of the issuance of the county deed on the redemption or repurchase to George W. Hudson on May 24, 1943. He knew that he was receiving a quitclaim deed from Myrtle Hudson. There is every reason to believe, although the record does not show it, that the cancellation of the original deed to George W. Hudson and the issuance of the new one to Myrtle Hudson was obtained to enable a transfer of the land direct to Hans Frandson and enable him and John H. Jackson to complete the negotiations for the sale and purchase of the land. Laches has no application to the issue here involved.

The answering defendants set up in their answer and counterclaim that the plaintiff has been in possession of the land since 1943, and that she has had the full use and occupation of the premises and received all of the profits from the said use and occupation thereof. They make a demand for an accounting for the use and occupation of the land. No evidence was presented upon this issue nor is it argued in the brief of the respondents. The issue must, therefore, be deemed abandoned.

We must next determine whether the quitclaim deed issued by Myrtle Hudson purporting to convey all of the property to Hans Frandson did in fact convey anything more than a one-third interest in the property. The quitclaim deed executed and delivered by Myrtle Hudson to Hans Frandson, dated April 26, 1945, states that said party of the first part, Myrtle Hudson,

> "*do hereby convey and quit claim* to said party of the second party, (Hans Frandson) his heirs and assigns forever, *all right, title and interest in and to* the certain tract of land in the County of Mountrail, State of North Dakota, described as follows;" (Emphasis supplied)

and then follows the description of the land. The deed is labeled as a *quitclaim* deed and is on a printed form. It did not operate to convey the entire fee in the land, although it was color of title. Morrison v. Hawksett, N.D., 64 N.W.2d 786. Nowhere does the word "grant" appear in the instrument. Where such word is used in a conveyance by which an estate of inheritance or fee simple is to be passed, certain covenants are implied. Section 47–1019, NDRC 1943. The quitclaim deed contains no covenant of warranty. See State v. Kemmerer, 14 S.D. 169, 84 N.W. 771, affirmed 15 S.D. 504, 90 N.W. 150. A quitclaim deed is one which purports to convey, and is understood to convey, nothing more than the interest or estate in the property described of which the grantor is seized or possessed, if any, at the time, rather than the property itself. 26 C.J.S., Deeds, § 8, p. 181. A quitclaim deed does not purport to convey the property, but only the grantor's right, title and interest therein. State v. Kemmerer, supra.

Since Myrtle Hudson was vested with only an undivided one-third interest in the land, her quitclaim deed to Hans Frandson conveyed only such interest as she owned. Hans Frandson acquired only the interest that she owned and that interest and no more descended to Lena Frandson through his estate. Accordingly Lena

Frandson is the owner of an undivided one-third interest in the property and Naomi Stenzel, Oralie Lorenz, Helen Jackson and Howard Hudson are the owners of the remaining two-thirds interest therein, each one being vested with a one-fourth interest of the two-thirds interest. Together said parties are the owners of the property as tenants in common. Patton on Titles, Sec. 249, p. 794; Stevahn v. Meidinger, N.D., 57 N.W.2d 1, 11.

The judgment of the trial court is affirmed.

BURKE, C. J., and SATHRE, MORRIS, and GRIMSON, JJ., concur.