Filed 4/12/11 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2011 ND 74

Michael Swanson, James Swanson, Robert 

Swanson and Candyce Johnson, Plaintiffs and Appellees

v.

Glenn K. Swanson, aka G.K. Swanson, Defendant and Appellant

Maggie McMillan, John F. Renick, Martha E. 

Renick, Riley Garrison, Peter Ellingson, aka Pete 

Ellingson, George Perrin, Arles O. Smith, 

Liberta Smith, Herman Soenke, Etta Soenke, 

David Keller, Cynthia Keller, Anna Garrison, aka 

Anna Swanson, Asmundur Swanson, William S. 

Swanson, the unknown heirs, devisees, legatees and 

successors in interest of William S. Swanson, deceased; 

Arlo C. Swanson, E. Lorraine Swanson, as Trustee of the 

E. Lorraine Swanson Revocable Trust, any unknown heirs, 

devisees and legatees or successors in interest of any of the 

named Defendants, be they deceased; all persons unknown 

claiming any interest in the property described in the 

complaint, Defendants

AND

Glenn K. Swanson, Third Party Plaintiff and Appellant

v.

E. Lorraine Swanson, Third Party Defendant and Appellee

No. 20090289

Appeal from the District Court of Bottineau County, Northeast Judicial District, the Honorable Michael G. Sturdevant, Judge.

REVERSED AND REMANDED.

Opinion of the Court by Maring, Justice.

Michael S. McIntee, P.O. Box 90, Towner, N.D. 58788-0090, for plaintiffs and appellees and third-party defendant and appellee.

Rudra Tamm, 222 North 4th Street, Bismarck, N.D. 58501-4004, for defendant and appellant.

Swanson v. Swanson

No. 20090289

Maring, Justice.

[¶1] Glenn K. Swanson appeals from the trial court’s judgment quieting title to certain real property located in Bottineau County in Michael Swanson, James Swanson, Robert Swanson, and Candyce Johnson (“Swanson children”).  We conclude the trial court improperly analyzed the notice requirement for good-faith purchasers under the law and erred in finding the Swanson children acted in good faith.  Therefore, we reverse the judgment of the trial court and remand for entry of judgment consistent with this opinion.

I

[¶2] The specific real property at issue has the following legal description:  “SW 1/4 of Section 33, Township 161 N, Range 75 W, Bottineau County, North Dakota,” and consists of 169 acres of farmland.  Anna Swanson, the stepmother of Glenn Swanson and William Swanson, owned this property in June 1963.  On June 1, 1963, she conveyed the property to William Swanson by warranty deed.  Glenn Swanson, an attorney and William Swanson’s brother, prepared and notarized the deed, which was recorded on December 2, 1966.

[¶3] On June 10, 1963, William Swanson and his wife, E. Lorraine Swanson, executed a warranty deed conveying the property to William Swanson and Glenn Swanson as joint tenants.  At the time of the deed’s execution, Lorraine Swanson did not have an ownership interest in the property; she signed the deed merely as an accommodation to waive any homestead claim.  The trial court found Glenn Swanson prepared the June 10, 1963, deed and presumably kept the deed in his possession for more than 42 years.  The trial court also found that, in November 1969, Glenn Swanson executed and recorded a mortgage on the property in favor of his brother, Arlo Swanson.

[¶4] William Swanson died on July 11, 1999.  His funeral took place a week later in Florida, but his ashes were buried in North Dakota during an inurnment ceremony in the summer of 2001.  Glenn Swanson testified that at the 1999 Florida funeral, he asked Lorraine Swanson to look for William Swanson’s copy of the June 10, 1963, joint tenancy deed, effectively asserting an ownership interest in the property.  In 2000, despite Glenn Swanson’s asserted ownership interest, Lorraine Swanson, as personal representative of William Swanson’s estate, conveyed the property to herself as trustee of her revocable trust by a personal representative’s deed of distribution dated April 3, 2000, and recorded in May 2000.  A year later, at the 2001 inurnment ceremony, Glenn Swanson again asserted an interest in the property by advising Robert Swanson, the son of William and Lorraine Swanson, that he, Glenn Swanson, owned the property.  Regardless of his ownership claim, however, on June 18, 2003, Lorraine Swanson, as trustee of her revocable trust, executed a warranty deed conveying the property to her four children and retaining a life estate for herself.  This deed was recorded on July 21, 2003.

[¶5] The trial court found that Glenn Swanson did not discover the June 10, 1963, joint tenancy deed until two years after the Swanson children recorded their deed.  The court found Glenn Swanson discovered the deed in his files some time in the spring or summer of 2005, and recorded it on November 2, 2005.  Then, in the summer of 2006, while he was visiting the home of Lorraine Swanson’s niece, Glenn Swanson showed Lorraine Swanson the recorded joint tenancy deed and advised her he was the rightful owner of the property under the deed.

[¶6] In January 2008, the Swanson children commenced this quiet title action against Glenn Swanson and other defendants to declare that Glenn Swanson had no valid claim of ownership in the property.  Glenn Swanson responded with a counterclaim against the Swanson children, seeking to quiet title in his name.  He also brought a third-party action against Lorraine Swanson based on her conveyance under the warranty deed.

[¶7] On July 14 and 15, 2009, the trial court held a bench trial.  After the trial, the court issued its memorandum opinion and order for judgment, finding Glenn Swanson had no interest in the property and quieting title in the Swanson children.  The court concluded the Swanson children’s claim to the property had priority under N.D.C.C. § 47-19-41.  In reaching this conclusion, the court found the Swanson children had acted in good faith when they recorded the deed and had paid valuable consideration for the property at issue.  The court dismissed Glenn Swanson’s counterclaim and third-party complaint.

II

[¶8] On appeal, Glenn Swanson argues the trial court erred in quieting title in the Swanson children because they were not good-faith purchasers and did not pay valuable consideration for the property conveyed from Lorraine Swanson’s trust.  Rather, Glenn Swanson asserts that under the June 10, 1963, deed, the property passed to him in 1999 as a joint tenant by operation of law when William Swanson died.

[¶9] The dispositive issue on appeal is whether the trial court erred in finding the Swanson children acted in good faith when they acquired the property from their mother as a trustee of her revocable trust.  The status of the Swanson children as good-faith purchasers depends on whether they had notice, actual or constructive, of Glenn Swanson’s ownership claim.  “A party’s status as a good faith purchaser without notice of a competing interest is a mixed question of fact and law.”  
Diocese of Bismarck Trust v. Ramada, Inc.
, 553 N.W.2d 760, 768 (N.D. 1996).  The factual circumstances  necessary to determine whether a party has attained the status of a good-faith purchaser without notice constitute findings of fact.  
Id.
  On the other hand, a trial court’s ultimate determination a party acted in good faith constitutes a conclusion of law “because the determination describes the legal effect of the underlying factual circumstances.”  
Id.
  Sections 47-19-41 and 1-01-25 of the North Dakota Century Code are relevant to determining whether the Swanson children were good-faith purchasers.

[¶10] Section 47-19-41, N.D.C.C., provides that “[e]very conveyance of real estate not recorded shall be void as against any subsequent purchaser in good faith, and for a valuable consideration . . . .”  Section 1-01-25, N.D.C.C., further explains that “[e]very person who has actual notice of circumstances sufficient to put a prudent person upon inquiry as to a particular fact and who omits to make such inquiry with reasonable diligence is deemed to have constructive notice of the fact itself.”  We have consistently held that a purchaser who fails to make the requisite inquiry cannot claim the protection of a good-faith purchaser status for purposes of N.D.C.C. § 47-

19-41.  
See
 
Hunt Trust Estate v. Kiker
, 269 N.W.2d 377, 381 (N.D. 1978) (citing 
Pierce Tp. of Barnes County v. Ernie
, 74 N.D. 16, 19 N.W.2d 755 (1945)).  Rather, a person who fails to make the proper inquiry will be charged with constructive notice of all facts that such inquiry would have revealed.  
See
 
Northern Pac. Ry. Co. v. Advance Realty Co.
, 78 N.W.2d 705, 715 (N.D. 1956) (stating the purchasers had sufficient notice to put them on inquiry and holding they had constructive knowledge of the adverse interest claims as a result of their failure to inquire).   Accordingly, the determination of the Swanson children’s status as good-faith purchasers turns first on whether they had “actual notice of circumstances sufficient to put a prudent person upon inquiry.”  N.D.C.C. § 1-01-25.  If the facts or circumstances were sufficient to put a prudent person on inquiry, then the Swanson children had a duty to conduct such inquiry with reasonable diligence.  
See
 
id.
  We conclude the circumstances in this case gave rise to a duty to inquire and, when the Swanson children failed to make any inquiry, they lost the protection of a good-faith purchaser status for purposes of N.D.C.C. § 47-19-41.

III

[¶11] In its memorandum opinion and order, the trial court found that in the summer of 2001, at William Swanson’s inurnment ceremony, “Glenn [Swanson] advised William and Lorraine’s son Robert that he (Glenn) owned the Property.”  The trial court concluded Glenn Swanson’s comment at the 2001 ceremony “must be deemed to be sufficient to have put the [Swanson children] on notice of Glenn’s purported claim of ownership.”  We agree with the trial court that the Swanson children had actual notice of circumstances sufficient to put a prudent person on inquiry, thus requiring them to inquire further into Glenn Swanson’s purported interest, but disagree with the trial court that the Swanson children acted in good faith.

[¶12] It has long been established that the information sufficient to put a prudent person on inquiry “may consist of a statement made by the claimant of the adverse right.”   5 Basil Jones, 
Tiffany on Real Property
 § 1285 (3d ed. 1939); 
see also
 
Bell v. Bell
, 87 S.E. 540, 542 (S.C. 1915) (holding that when a person asserts an ownership interest of certain property to another, such information is notice of that person’s purported interest in the property); 
Davis v. Kennedy
, 105 Ill. 300, 1883 WL 10130, *2 (Ill. Jan. 31, 1883) (“Where a person has been, before purchasing, informed of the equities of a third person, he should make inquiry of such person, and if he does not, he is chargeable with notice.”).  We first addressed the sufficiency of an adverse ownership statement in placing a prudent person on inquiry in 
Pierce Tp. of Barnes County v. Ernie
, 74 N.D. 16, 19 N.W.2d 755 (1945).  We held the respondent had sufficient facts to place him under a duty to conduct further inquiry into Pierce Township’s purported interest in the property.  
Id.
 at 760.  We explained:

The record contains an array of circumstances that militate against the good faith of the respondent within the meaning of that term as used in [N.D.C.C. § 47-19-41].  . . . [T]he respondent lived but ten rods from the Pierce Pit.  He knew that someone had opened it up and was hauling gravel from it. His admissions indicate that 
he had heard
 that Pierce Township had bought or was contemplating buying a pit from the  Bloedel tract.

Id.
 at 759-60 (emphasis added).  Similarly, in 
Hunt Trust Estate
, we concluded that upon being informed the property was leased to another, the prospective purchaser “had a duty, as a prudent man, to make further inquiry to determine the nature and extent of the lease of which he had been informed.”  269 N.W.2d at 381.  In 
Nygaard v. Robinson
, we further elaborated on the type of information sufficient to put a prudent person on inquiry:

The information need not be so full and detailed as to communicate a complete description of the opposing party interest.  It is sufficient if it asserts the existence of a right or interest as a fact. . . . 
It need not state all the particulars or impart complete knowledge.
  It is enough if he has 
reasonable ground to believe that a conflicting right exists as a fact.

341 N.W.2d 349, 356 (N.D. 1983) (citations omitted) (emphasis added).

[¶13] The record establishes that at William Swanson’s 2001 inurnment ceremony, Glenn Swanson informed Robert Swanson that he, Glenn Swanson, owned the property under the June 10, 1963 joint tenancy deed.  Glenn Swanson was Robert Swanson’s uncle and his father’s brother.  It was undisputed that throughout the course of events, Glenn Swanson acted as William and Lorraine Swanson’s attorney and managed the property and made arrangements with tenants.  The Swanson children were aware of his role and his involvement in their father’s business affairs.  At trial, James Swanson testified: “[I]t was well known in the family that Uncle Glenn was our attorney.”  Based on the record and the applicable law, we conclude Glenn Swanson’s 2001 ownership statement was sufficient to charge the Swanson children with actual notice of Glenn Swanson’s adverse ownership claim and place them under an obligation to make further inquiry into his purported interest in the property.  Therefore, the trial court did not err in finding the Swanson children had information sufficient to put a prudent person on inquiry of Glenn Swanson’s adverse ownership claim.  The trial court, however, did err in concluding the Swanson children acted in good faith.

[¶14] The record in this case is void of any evidence establishing the Swanson children made any inquiry into Glenn Swanson’s purported ownership interest in the property.  In fact, the trial court itself stated that “[i]t is not known what inquiry, if any, the [Swanson children] made with regard to Glenn’s claim.”  The law, however, is uncontroverted:  “A purchaser who has actual notice of facts or circumstances which would put a prudent man upon inquiry is deemed to have constructive notice of those facts which such inquiry would in all probability have disclosed had it been properly pursued.”  
Hunt Trust Estate
, 269 N.W.2d at 380 (citing 
Northern Pac. Ry. Co.
, 78 N.W.2d 705).  A reasonably diligent inquiry here would have required the Swanson children, at the very least, to conduct a record search.

[¶15] North Dakota uses a tract index system for recording real estate transactions, which makes all instruments easily accessible by focusing on the tract of land in question, rather than on the grantor or grantee of the land.  
Hanson v. Zoller
, 187 N.W.2d 47, 55 (N.D. 1971); 
see also
 N.D.C.C. § 11-18-07 (requiring a recorder to keep a tract index of all deeds and other instruments, including mortgages, that affect the title to the real property).  Thus, under North Dakota’s tract index system, the names of the grantor or grantee are irrelevant; rather, the title is traced by searching for instruments, including mortgages, that pertain to the tract of land.  
Hanson
, 187 N.W.2d at 56.  “The fundamental purpose of the recording statutes is to protect potential purchasers of real property against the risk that they may be paying out good money to someone who does not actually own the property that he is purporting to sell.”  
Id.
 at 54.  “The recording acts operate by making the history of the title involved in a real estate transaction readily available to a prospective purchaser, and by providing that the history so disclosed by the record is binding upon a prospective purchaser whether he consults the record or not.”  
Id.
  As prospective purchasers put on notice of Glenn Swanson’s adverse ownership claim, the Swanson children had a duty to conduct a record search and examine the tract index.  
See
 
id.
 at 55-56; 
see also
 66 Am. Jur. 2d 
Records and Recording Laws
 § 99 (2010) (providing that when a statute requires a tract index be kept, a subsequent purchaser is under a duty to examine that index).  A simple record search by the Swanson children would have revealed the 1969 mortgage Glenn Swanson recorded on the property, identifying him as the mortgagor and giving his brother, Arlo Swanson, a security interest in Glenn Swanson’s then-one-half ownership interest in the property.

[¶16] The trial court relies on Title Standard 2-01 of the North Dakota State Bar Association to conclude that the mortgage is of no evidentiary value and could be ignored.  
See also
 N.D.C.C. § 47-19-46 (explaining that knowledge of an instrument outside the chain of title does not constitute constructive knowledge under the law). However, the trial court quotes only part of the Standard.  Title Standard 2-01 states:

Conveyances by strangers to the chain of title may be disregarded, unless a title examiner has actual notice or knowledge (through sources other than the record) of the interest of the grantor, or unless subsequent to such conveyance there is recorded a deed or other conveyance vesting title in such stranger.

. . .

Caveat: In order to ignore conveyances from a “stranger” the “good faith” test of the Recording Act (NDCC 47-19-41) must be met.  Any circumstances which should cause further inquiry to be made as to the status of the “stranger” which inquiry would disclose the unrecorded interest of the “stranger”, preclude ignoring the “stranger’s” conveyance.

Id.
 (State Bar Ass’n of North Dakota 2009).  The trial court found Glenn Swanson was a stranger to the chain of title at the time the 1969 mortgage was recorded and, therefore, concluded the recording of the mortgage has no evidentiary value.  The circumstances here, however, “preclude ignoring the ‘stranger’s’ conveyance.”  
Id.  
It is  undisputed that at the 2001 inurnment ceremony, Glenn Swanson advised Robert Swanson that he, Glenn Swanson, was the rightful owner of the property following William Swanson’s death. 

[¶17] Under Title Standard 2-01, a prospective purchaser may ignore such a conveyance only if the purchaser meets the “good faith” test of N.D.C.C. § 47-19-41.  
See
 Title Standard 2-01. Thus, any circumstances, which should cause further inquiry into the status of the “stranger” preclude the prospective purchaser from ignoring the “stranger’s” conveyance.  
Id.
  Given the factual circumstances of this case, a prudent person acting with reasonable diligence would have made further inquiries of Glenn Swanson to ascertain whether in fact he owned the land.  
See
 
Doran v. Dazey
, 5 N.D. 167, 64 N.W. 1023, 1025 (1895) (explaining that a prudent man on inquiry of a purported claim of ownership would have asked the mortgagor if he owned the land); 
see also
 
Miller v. Henner
, 438 N.W.2d 366, 371 (Minn. 1989) (holding the purchaser’s investigation of the recorded mortgage, which consisted of visiting the property, searching the tract index for other instruments, and contacting the record owner, to be a reasonable off-record search of the title to the property); N.D.C.C. § 47-19-19 (“The record of any instrument shall be notice of the contents of the instrument, as it appears of record, as to all persons.”).  The Swanson children had actual notice of Glenn Swanson’s ownership claim and could have easily asked Glenn Swanson to prove his ownership interest by providing the original or a copy of the 1963 warranty deed, which conveyed the property to him and the Swanson children’s father, William Swanson, as joint tenants.  They could have also asked their mother, Lorraine Swanson, about her signing the 1963 deed and about Glenn Swanson’s request for her to search for the deed at their father’s 1999 Florida funeral.  Instead, the Swanson children chose to do nothing.  Doing nothing is not acting with “reasonable diligence.”  Although, as the trial court found, Glenn Swanson’s 2001 comment put the Swanson children on notice of Glenn Swanson’s purported ownership claim, the Swanson children chose to ignore their duty to inquire into this claim with reasonable diligence.  They did not conduct a record search.  They did not inquire whether Glenn Swanson did, in fact, own the land.  They did not inquire of their mother, the alleged owner of the property, about Glenn Swanson’s adverse ownership claim.

[¶18] The dissents state we should affirm the trial court's conclusion the Swanson children acted in good faith and emphasize the trial court's finding that a “reasonable inquiry properly pursued would have disclosed . . . Glenn could not produce the original of the June 10, 1963 Joint Tenancy Warranty Deed nor a copy thereof.” Sandstrom, J., dissenting, at ¶ 31 (stating that even if the children had pursued an inquiry, Glenn Swanson could not have produced the deed); Vande Walle, C.J., dissenting, at ¶ 53 (emphasizing Glenn Swanson would have been unable “to come up with a deed anyway”).  We are not persuaded.  First, Glenn Swanson’s presumed inability to produce the original or a copy of the deed cannot excuse the Swanson children’s failure to make the requisite reasonable inquiry under the law.  
Hunt Trust Estate
, 269 N.W.2d at 381 (holding that upon being informed the property was leased to another, the prospective purchaser had a duty to further inquire into the nature and extent of the lease).  Second, even if Glenn Swanson could not produce the original or a copy of the deed, our case law allows for an action to establish title to real estate by virtue of a lost deed.  
See, e.g.
, 
Nelson v. Christianson
, 343 N.W.2d 375 (N.D. 1984) (addressing the requirements to prove a lost deed in a quiet title action);
 Tostenson v. Ihland
, 147 N.W.2d 104 (N.D. 1966) (explaining the burden of proof in actions to sustain title to real estate by virtue of a lost deed); 
Stone v. Stone
, 238 N.W. 81 (N.D. 1931) (discussing an action to quiet title in which defendant claimed under lost deed).  Therefore, we conclude Glenn Swanson’s ability, or lack thereof, to produce the original or a copy of the deed back in 2001 is not dispositive on the issue of whether the Swanson children were good-faith purchasers.  We hold the Swanson children failed to make the requisite inquiry into Glenn Swanson’s ownership interest and, consequently, cannot claim the protection afforded to good-faith purchasers under N.D.C.C. § 47-19-41.

IV

[¶19] The trial court found the Swanson children had actual notice of circumstances sufficient to put a prudent person on inquiry as to Glenn Swanson’s purported ownership claim.  Under the law, therefore, the Swanson children had to make such inquiry with reasonable diligence.  
See
 N.D.C.C. § 1-01-25.  They did not.  In fact, the Swanson children made no inquiry at all.  Our case law is clear:  “A purchaser who fails to make such inquiry is not protected as a good faith purchaser under § 47-

19-41, N.D.C.C., with regard to those prior interests of which he is deemed to have constructive notice by his failure to make such inquiry.”  
Hunt Trust Estate
, 269 N.W.2d at 381.  Moreover, we have consistently held that “it is the performance of the duty and not the understanding of it or lack thereof that determines the rights of the parties.”  
Pierce Tp.
, 19 N.W.2d at 760.  Thus, when the Swanson children failed to make the requisite inquiry, they lost their protection as good-faith purchasers.  As a result, the trial court erred, as a matter of law, in concluding the Swanson children acted in good faith when they proceeded to record their deed.  Therefore, we reverse.  Because we reverse the judgment of the trial court and hold the Swanson children were not good-faith purchasers for purposes of N.D.C.C. § 47-19-41, we need not reach the issue of whether they paid valuable consideration for the property. We do take this opportunity, however, to address why the equitable remedies of laches and estoppel are not available to the Swanson children.

[¶20] The general rules of pleading require that a party shall state affirmatively in a pleading laches and estoppel.  N.D.R.Civ.P. 8(c).  In the present case, the Swanson children never set forth affirmatively either laches or estoppel in their complaint or answer to counterclaim.  Even if it could be argued that the parties tried the issues of laches and estoppel by consent and that these issues are properly before the Court, we conclude that reliance on these equitable remedies is unfounded.

[¶21] Our Court has held that when the vendee is not a good-faith purchaser of the property, the vendee cannot rely on the doctrines of equitable estoppel and laches.  
See
 
Burlington Northern, Inc. v. Hall
, 322 N.W.2d 233, 239-40, 242 (N.D. 1982).  Burlington Northern brought a quiet title action asserting ownership of certain mineral rights in twelve sections of land.  
Id.
 at 237.  The Mossers and the Hall heirs also asserted ownership of these mineral rights.  
Id.
  Northwestern Improvement was the named owner of the entire fee simple estate and the Mossers entered into a contract for deed to buy the land from Northwestern.  
Id.
 at 236.  The contract for deed was dated April 15, 1944, and was not recorded.  
Id.
  The contract for deed reserved the minerals unto the vendor Northwestern.  
Id.
  In 1948, the Mossers listed for sale the twelve sections of land.  
Id.
  A contract for deed was entered into between the Mossers and L. P. Hall for the twelve sections.  
Id.
  The contract for deed was recorded on January 12, 1949.  
Id.
  On December 27, 1948, the Mossers made their final payments on the contract with Northwestern; Northwestern deeded the land to the Mossers by warranty deed dated December 29, 1948; and recorded the deed February 23, 1949.  
Id.
  The warranty deed conveying the land to the Mossers excepted the minerals.  
Id.
  The Mossers, by a warranty deed dated August 29, 1951, deeded the twelve sections to Hall and the deed was recorded on September 7, 1951.  
Id.
  The warranty deed excepted unto the Mossers fifty percent of all remaining minerals.  
Id.
  Meanwhile, Northwestern deeded the minerals to Northern Pacific Railway and recorded the mineral deed on April 29, 1953.  
Id.
 at 237.  Burlington Northern was the successor in the interest of Northern Pacific Railway.  
Id.

[¶22] The trial court found that Hall was “chargeable with actual, constructive or implied knowledge of the terms of the 1944 contracts between the Mossers and Northwestern” and not a bona fide purchaser.  
Id.
 at 237-38.  The trial court held that Burlington Northern was the owner in fee simple of all the minerals.  
Id.
 at 237.

[¶23] Among the claims on appeal, “[t]he Hall heirs asserted that because of the deliberate failure of Northwestern to record its contract for deed with Mossers and because of Burlington Northern’s deliberate failure to record its deed seasonably, Burlington Northern should be equitably estopped from asserting title to the prejudice of the Hall heirs.”  
Id.
 at 239.  Our Court stated:

The rule as to the requisites of an estoppel in pais as applied to the title to realty which appeals to us as the most equitable to all parties is that . . . [i]t is undoubtedly true that a party may in many instances be concluded by his declarations or conduct, which have influenced the conduct of another to his injury.  The party is said in such cases to be estopped from denying the truth of his admissions.  But to the application of this principle with respect to the title of property it must appear:  First, that the party making the admission by his declaration or conduct was apprised of the true state of his own title; second, that he made the admission with the express intention to deceive or with such careless and culpable negligence as to amount to constructive fraud; third, that the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge; and, fourth, that he relied directly upon such admission, and will be injured by allowing its truth to be disproved.  There must be some degree of turpitude in the conduct of a party before a court of equity will estop him from the assertion of his title; the effect of the estoppel being to forfeit his property, and transfer its enjoyment to another.

Id.
 at 239-40 (quoting 
Gjerstadengen v. Hartzell
, 9 N.D. 268, 83 N.W. 230, 232 (1900)).  Our Court held that “equitable estoppel must fail because they have not met the third requirement set out above. That requirement is that they were destitute of all knowledge of the true state of title and of the means of acquiring such knowledge.”  
Id.
 at 240.  We further said:

Although the railroad deliberately may not have recorded its mineral deed, a finding upon which we express no opinion, we believe the fact that the deeds were unrecorded is of little significance because L. P. Hall had constructive notice of the mineral reservation in the Northwestern-Mossers instrument. Based on this, we believe the Hall heirs’ reliance upon the doctrine of equitable estoppel is unfounded.

Id.

[¶24] The Hall heirs also raised an issue of laches.  
Id.
 at 242.  They asserted that Burlington Northern’s quiet title action should be barred by laches.  
Id.
  We held:

Laches is an equitable doctrine, and cases involving laches must stand or fall on their own facts and circumstances.  Laches does not arise from a delay or lapse of time alone, and in addition to the time element, the party against whom laches is sought to be invoked must be actually or presumptively aware of his rights and must fail to assert them against a party who in good faith permitted his position to become so changed that he could not be restored to his former state. 

Id.
 at 242 (citations omitted).  Recognizing that laches is an equitable concept, we held that “[b]ecause we do not believe either party is entitled to any greater equitable considerations than the other party, and taking into account the total factual circumstances of this case, we do not believe Burlington Northern’s quiet title action should be barred by laches.”  
Id.

[¶25] In a subsequent case, June Deck was awarded real property in a 1984 California divorce decree.  
Erway v. Deck
, 1999 ND 7, ¶ 2, 588 N.W.2d 862.  A California grant deed transferred the real property to June Deck but was not recorded in Stark County until September 26, 1997.  
Id.
  Meanwhile, the Erways obtained judgment against Stanley Deck, June Deck’s former husband, and filed their judgment in Stark County on May 30, 1991.  
Id.
 at ¶ 3.  On September 16, 1997, the clerk of the district court for Stark County issued an execution on the foreign judgment, and the Sheriff levied on Stanley Deck’s interest in the property.  
Id.
  June Deck objected and moved to dismiss the levy.  
Id.
  Our Court noted that “North Dakota law unequivocally recognizes a person who has actual notice of facts sufficient to put a prudent person on inquiry about a particular fact, but who omits to inquire with reasonable diligence, is deemed to have constructive notice of the facts an inquiry would have revealed.”  
Id.
 at ¶ 10.  We concluded the facts were undisputed that the Erways became aware in 1987 of the divorce settlement agreement transferring the property to June Deck, which put them on actual notice sufficient to provoke a prudent person to make further inquiry about June Deck’s interest.  
Id.
 at ¶ 12.  We also concluded:

June Deck’s failure to record the 1984 grant deed until 1997 does not estop her from claiming title to the property.  In 
Burlington Northern
, 322 N.W.2d at 239-40, 242, we rejected similar estoppel and laches arguments. Under this Court’s reasoning in 
Burlington Northern
, June Deck is not barred by estoppel or laches from asserting ownership of the property, because the Erways were not destitute of all knowledge of the true state of the title and they had a means of acquiring knowledge about title to the property.

Id.
 at ¶ 13; 
see also
 
Natural Resources, Inc. v. Wineberg
, 349 F.2d 685, 691 (9th Cir. 1965) (holding Natural Resources, Inc. was not a bona fide purchaser and that determination was fatal to its claim based on estoppel).

[¶26] Likewise, in the present case, the Swanson children are not good-faith purchasers and under the reasoning of 
Burlington Northern
, the Swanson children do not have any estoppel or laches arguments.

[¶27] The two cases cited by Justice Sandstrom’s dissent are distinguishable.  Neither 
Hanika v. Rawley
, 368 N.W.2d 32 (Neb. 1985) nor 
Eggart v. Tennant
, 68 So.2d 714 (Ala. 1953) involved vendees who were found not good-faith purchasers.

V

[¶28] The judgment of the trial court is reversed and the matter remanded for entry of judgment consistent with this opinion.

[¶29] Mary Muehlen Maring

Daniel J. Crothers

Carol Ronning Kapsner

Sandstrom, Justice, dissenting.

[¶30] I respectfully dissent.

[¶31] The majority holds that the children were required to make reasonable inquiry into Glenn Swanson’s claim of title, but did not, and therefore they lost their “good faith purchaser for value” status.  The majority bases its position on the premise that Glenn Swanson’s “cemetery claim” of ownership put the Swanson children on notice of his claim of title.  This holding ignores that the legal consequence of a failure to make “reasonable” inquiry is that the children would be charged only with knowledge of those facts the inquiry would have yielded.  
Williston Cooperative Credit Union v. Fossum
, 427 N.W.2d 804, 807 (N.D. 1988) (“One with actual knowledge of facts which would put a prudent person upon inquiry as to the claims of others in the property is deemed to have constructive notice of 
only
 those facts which an inquiry would have revealed.”) (emphasis added).  The record is clear that inquiry would have yielded nothing.  Glenn Swanson said he could not find the deed and Lorraine Swanson had no recollection of it.

[¶32] I would affirm the district court’s findings of fact that the Swanson children were good-faith purchasers for value under the statute.  If it were necessary, I would remand to the district court to decide the equitable remedies it did not need to reach.

I

[¶33] There are a number of factual disputes the district court did not decide, because even accepting Glenn Swanson’s “facts,” he lost.  For example, the majority opinion, at ¶ 3, says, “On June 10, 1963, William Swanson and his wife, E. Lorraine Swanson, executed a warranty deed conveying the property to William Swanson and Glenn Swanson as joint tenants.”  But the district court did not find that.  Lorraine Swanson disputed it, although she acknowledged the signature on the deed “looked like” her husband’s and her signatures, but she also said that her purported signature on Glenn Swanson’s purported 1963 deed had her signature as “E. Lorraine Swanson” and that she did not begin including the “E.” in her signature until 1977.  What the district court said was that “
[f]or purposes of this Opinion
 . . . On June 10, 1963 William and his wife Lorraine 
apparently
 signed a Warranty Deed conveying the Property to William and Glenn as joint tenants.”  (Emphasis added.)

[¶34] The district court did not find that “in November 1969, Glenn Swanson executed and recorded a mortgage on the property in favor of his brother, Arlo Swanson.”  Instead, the district court said:

Glenn places considerable weight on the mortgage covering the Property which he granted to his brother Arlo.  (Exhibit 25).  However, Glenn was a stranger to record title at the time this mortgage was recorded in 1969.  Conveyances (and encumbrances) by strangers to the chain of title may be disregarded and ignored according to North Dakota Title Standard 2-01.  Thus this encumbrance is of no evidentiary value.

[¶35] The district court noted the highly suspect aspect of Glenn Swanson’s not filing the deed for 42 years, arguably waiting for William Swanson to die.  Contrary to the interpretation at ¶ 5 of the majority opinion, the district court did not find that Glenn Swanson “discovered” his deed as he claimed.  Instead, the district court assumed the fact for its good-faith purchaser statutory analysis and said Glenn Swanson lost anyway.  The district court then said:

Notwithstanding its reluctance to point an accusatory finger at any party or witness, this court must state that Glenn’s testimony is simply not credible.  Throughout the history of his dealings with the Property Glenn’s involvement can only, at best, be described as “questionable”.  Less charitable descriptions such as “shady” may be more appropriate when one looks at activities of a lawyer representing family members who prepares documents beneficial to him and then presents self serving testimony regarding alleged statements or arrangements with long deceased family members.

The record reflects that lawyer Glenn Swanson was repeatedly suspended and then disbarred for exploiting the estates of deceased persons.  
See
 
Matter of Swanson
, 337 N.W.2d 434 (N.D. 1983); 
Disciplinary Board v. Swanson
, 538 N.W.2d 778 (N.D. 1995); 
Disciplinary Board v. Swanson
, 1998 ND 60, 575 N.W.2d 218; 
Disciplinary Board v. Swanson
, 2002 ND 6, 638 N.W.2d 240.

[¶36] Even if the deed was in fact executed in 1963, it was not filed for 42 years.  Why not?  Was it a “marker” for debt, and once the debt was satisfied did lawyer Glenn Swanson tell his farmer brother, “I tore up the deed,” or “I never filed it, so it’s gone”?  The documentary evidence in this case is consistent with such a scenario—that Glenn Swanson paid taxes and received income from the land for only one and a half years, and that he never did anything that could be construed as a hint of ownership for the last 29 years of his brother’s life.  And after 1965, all of William Swanson’s conduct was consistent with his exclusive ownership.

[¶37] The majority highlights the district court’s finding that “Glenn’s summer of 2001 comment to Robert that he owned the Property, for purposes of this discussion, must be deemed to be sufficient to have put the Plaintiffs on notice of Glenn’s purported claim of ownership.”  This notice imputes to the Swanson children constructive notice 
only
 of the facts further inquiry would have revealed.  
Erway v. Deck
, 1999 ND 7, ¶ 10, 588 N.W.2d 862.  We stated in 
Erway
:

North Dakota law unequivocally recognizes a person who has actual notice of facts sufficient to put a prudent person on inquiry about a particular fact, but who omits to inquire with reasonable diligence, is deemed to have constructive notice of the facts an inquiry would have revealed.  N.D.C.C. § 1-01-25.  
See
 
Diocese of Bismarck Trust v. Ramada Inn
, 553 N.W.2d 760, 768 (N.D. 1996); 
Williston Co-op. Credit Union v. Fossum
, 427 N.W.2d 804, 807 (N.D. 1988); 
Nygaard v. Robinson
, 341 N.W.2d 349, 355-56 (N.D. 1983); 
Earth Builders, Inc. v. State
, 325 N.W.2d 258, 260 (N.D. 1982); 
Burlington Northern, Inc. v. Hall
, 322 N.W.2d 233, 242 (N.D. 1982); 
Hunt Trust Estate v. Kiker
, 269 N.W.2d 377, 381 (N.D. 1978); 
Putnam v. Dickinson
, 142 N.W.2d 111, 122 (N.D. 1966); 
City of Bismarck v. Casey
, 77 N.D. 295, 43 N.W.2d 372, 379 (1950); 
Agricultural Credit [Corp. v. State]
, 20 N.W.2d [78,] 81-82 [(N.D. 1945)]; 
Pierce Twp. v. Ernie
, 74 N.D. 16, 19 N.W.2d 755, 758 (1945); 
Harry E. McHugh, Inc. v. Haley
, 61 N.D. 359, 237 N.W. 835, 838-39 (1931); 
McCoy [v. Davis]
, 164 N.W. [951,] 952 [(N.D. 1917)]; 
Ildvedsen [v. First State Bank of Bowbells]
, 139 N.W. [105,] 107 [(N.D. 1912)].

Id.
  The majority opinion states that under Title Standard 2-01 of the North Dakota State Bar Association, the 1963 mortgage recorded by Glenn Swanson would have revealed his purported ownership interest.  As Glenn was a stranger to the chain of title, this mortgage would have been ignored if such inquiry had been conducted.  The majority holds that Title Standard 2-01 necessitates consideration of this mortgage by stating, “Conveyances by strangers to the chain of title may be disregarded, unless a title examiner has 
actual notice or knowledge
 (through sources other than the record) 
of the interest of the grantor
 . . . .”  (Emphasis added.)  The Swanson children had no knowledge of any actual interest Glenn Swanson held; they had notice of his 
claim
.  Using a bare, unsubstantiated claim to establish title in a stranger is the type of injustice Title Standard 2-01 seeks to prevent, but this is what has happened in this case.

[¶38] While the Swanson children were on notice of Glenn’s purported claim, this claim does not equate with knowledge of the title’s true state.  The district court’s succeeding analysis reinforces this point.  After reciting a long list of the factual circumstances entered into evidence and fairly considered at trial, the court concluded that “a reasonable person aware of the foregoing litany could have a rational belief that Glenn’s comment to Robert asserting ownership was either simply erroneous or a deceptive bluff.”  This was based on the court’s findings regarding Glenn Swanson’s credibility during the trial:

Throughout the history of his dealings with the Property Glenn’s involvement can only, at best, be described as “questionable”.  Less charitable descriptions such as “shady” may be more appropriate when one looks at activities of a lawyer representing family members who prepares documents beneficial to him and then presents self serving testimony regarding alleged statements or arrangements with long deceased family members.

Good faith is defined by N.D.C.C. § 1-01-21:  “Good faith shall consist in an honest intention to abstain from taking any unconscientious advantage of another even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious.”

[¶39] The conclusion as to whether a person or group has acted as a “good faith purchaser” is based on factual findings, as the majority correctly notes.  The district court, having heard the testimony and seen the evidence directly at trial, was in a superior position to establish the facts of the case.  
See
 
State v. Goebel
, 2007 ND 4, ¶ 11, 725 N.W.2d 578.  I would affirm the district court’s findings of fact and its order for judgment.

II

[¶40] In its decision, the district court said:

A quiet title action is an equitable remedy.  65 Am. Jur. 2d Quieting Title, § 2.  Thus, such equitable doctrines as estoppel, laches and clean hands would be applicable.  However, since a result has been achieved through a statutory basis it is not necessary to explore or employ these theories in the pursuit of a just result.

[¶41] Because this case was resolved on a statutory basis, the district court expressly declined to consider the equitable remedies of estoppel and laches.  When these remedies are explored, however, they reinforce the district court’s order for judgment.

[¶42] This Court has established a four-part test for applying equitable estoppel:

1) The party making the admission by his declaration or conduct was apprised of the true state of his own title; 

2) He made the admission with the express intention to deceive or with such careless and culpable negligence as to amount to constructive fraud; 

3) The other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge; 

4) [The other party] relied directly upon such admission, and will be injured by allowing its truth to be disproved.

Burlington Northern, Inc. v. Hall
, 322 N.W.2d 233, 240 (N.D. 1982) (quoting 
Gjerstadengen v. Hartzell
, 9 N.D. 268, 83 N.W. 230, 232 (1900)).

[¶43] Factor one in the equitable estoppel test states that such an admission may be made through conduct.  
Burlington Northern
, 322 N.W.2d at 240.  Such conduct can include silence, such as that exhibited by Glenn Swanson:  “An essential element of such an estoppel is a representation which may consist of words, 
acts or silence
, believed and relied upon by the party claiming the benefit of the estoppel which induced him to act or refrain from acting, to his prejudice.”  
Frandson v. Casey
, 73 N.W.2d 436, 446 (N.D. 1955) (emphasis added).  “It is enough if the party has been induced to refrain from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss.”  
Id.
 (citation omitted).

[¶44] The Nebraska Supreme Court decided a similar case in 
Hanika v. Rawley
, 220 Neb. 45, 368 N.W.2d 32 (1985).  In 
Hanika
, the decedent grandfather devised separate pieces of property to his two grandchildren in his will.  
Id.
 at 33.  These devises were subsidiary to a life estate the grandfather had given to his son in the same properties.  
Id.
  The will was probated in 1955, and the son did not dispute the will or claim any additional interest in the properties at that time.  
Id.
  In 1982, however, the son filed a purported warranty deed the grandfather had given him just months before his death, and which the son had kept ever since in his safe.  
Id.
 at 34.  This deed allegedly gave the son the properties in fee simple, was witnessed, and contained the grandfather’s signature.  
Id.
  The grandfather and the witnesses were already deceased by this time, and the son himself died before the case went to trial.  The Nebraska Supreme Court refused to honor the purported deed under the doctrine of equitable estoppel:

The withholding of the alleged deed until after the death of the grantor and the subscribing witnesses obviously afforded to the plaintiffs a distinct advantage and a distinct disadvantage to the defendants, to wit, the lack of opportunity to explore firsthand the genuineness of the signatures on the deed and the validity of its execution.  Although a person is not bound under all circumstances to speak out, but where his silence enables him to acquire unfair advantage over another in the settlement of property rights, it is his duty to speak.  Guilty silence may work an estoppel as effectually as an express representation.

Hanika
, 368 N.W.2d at 35 (quotation omitted).

[¶45] This case appears to track 
Hanika
 in all important respects.  Glenn Swanson silently held his purported deed for over 42 years, which placed the Swanson children at a distinct disadvantage because they had no knowledge of this deed’s existence.  Glenn Swanson’s behavior arguably meets all four parts of the equitable estoppel test:  he knew of the alleged title he held when he remained silent for over 42 years; this silence was either culpable negligence or outright fraud; the Swanson children did not know of the deed and had no way of discovering its existence; and they relied on Glenn Swanson’s silence to their injury.  The Nebraska Supreme Court’s language in 
Hanika
 appears to speak directly to Glenn Swanson’s behavior:  “[W]here his silence enables him to acquire unfair advantage over another in the settlement of property rights, it is his duty to speak.”  
Hanika
, 368 N.W.2d 32, 35 (quotation omitted).  Glenn Swanson did not reveal the deed’s existence until after the time had passed when the Swanson children could adequately protect their rights.  Accordingly, Glenn Swanson’s attempt to produce a stale deed after 42 years of concealment is likely barred by equitable estoppel.

[¶46] In addition to equitable estoppel, the district court also stated that laches would be applicable in this case.  This Court has summarized the doctrine of laches in North Dakota:

Laches is a delay or lapse of time in commencing an action that works a disadvantage or prejudice to the adverse party because of a change in conditions during the delay.  However, the mere delay or lapse of time in commencing an action does not of itself constitute laches.  Whether or not laches bars a claim must be determined by examining the underlying facts and circumstances of each particular case.

Williams County Social Services Bd. v. Falcon
, 367 N.W.2d 170, 174 (N.D. 1985) (quotation and citations omitted).

[¶47] In 
Eggart v. Tennant
, 260 Ala. 9, 68 So.2d 714 (1953), the Alabama Supreme Court applied laches to a case in which a deed had apparently been delivered forty years earlier but subsequently lost.  The Alabama Supreme Court stated: 

The rule of laches is well understood.  It precludes relief where, as the result of delay, the original transactions have become so obscure by lapse of time or loss of evidence as to render it difficult or hazardous to do justice or danger of doing injustice.  This rule has application where the matter is not pressed until after the death of adverse party or material witness, or loss or destruction of the evidence that could have explained or denied the contentions made by adverse interest.

Id.
 at 717.  The Alabama Supreme Court concluded the 40-year gap between delivery and execution of the deed constituted such a delay that any relief claimed under the deed would be “doubtful, uncertain, unfair and unjust.”  
Id.
 at 718.

[¶48] The Alabama Supreme Court’s reasoning in concluding laches applied appears applicable here.  The facts and circumstances crucial to this case are that Glenn Swanson silently held his deed for over 42 years, the person who allegedly executed and delivered the deed died in the interim, and only after the death of this material witness did Glenn Swanson reveal to the Swanson children the existence of his deed.  Glenn Swanson sat on his alleged rights until William Swanson’s death, which removed any possibility of a fair appraisal of the deed’s initial or continued validity.  As in 
Eggart
, granting relief under Glenn Swanson’s deed appears doubtful, uncertain, unfair, and unjust, and barred by the doctrine of laches.

[¶49] The equitable doctrines of estoppel and laches likely bar Glenn Swanson’s attempt to have his deed honored.

III

[¶50] I would affirm the district court’s order for judgment.  In his dissenting opinion, the Chief Justice would remand for the district court to readdress whether there was valuable consideration.  Although the district court did make findings and the majority does not base its analysis on the issue, if this case were remanded, the district court could reevaluate its prior findings on valuable consideration as well as address the issues it said it need not reach, including equitable remedies, and “the Plaintiff’s assertions casting doubt on the preparation and execution of Glenn’s Deed and the legal validity of same.”

[¶51] Dale V. Sandstrom

VandeWalle, Chief Justice, dissenting.

[¶52] 
I respectfully dissent.  I join in Justice Sandstrom’s dissent on the issue of good faith.  But, because I believe the trial court erred in deciding whether the Swanson children provided a “valuable consideration” for the property, I would reverse and remand for further consideration of that issue.

[¶53] On the issue of the good faith of the children, the trial court stated:

Glenn’s summer of 2001 comment to Robert that he owned the Property, for purposes of this discussion, must be deemed to be sufficient to have put the Plaintiffs on notice of Glenn’s purported claim of ownership.  It is not known what inquiry, if any, the Plaintiffs made with regard to Glenn’s claim.  However, we can conclude that reasonable inquiry properly pursued would have disclosed the following:

1. Glenn could not produce the original of the June 10, 1963 Joint Tenancy Warranty Deed nor a copy thereof.  Glenn acknowledged that he did not find this Deed until a few months before recording same in 2005.  This fact is bolstered by Glenn’s testimony that he had asked Lorraine if she had the Deed at some point in time after William’s death.

2. Record title to the Property was in the name of Lorraine as Trustee of her Revocable Trust.

3. Lorraine was receiving the income from the Property and, prior to his death, it appeared that William was the recipient of all of the income attributable to the Property.

4. For at least thirty-five years William and/or Lorraine had been paying the real estate taxes on the Property.  The only exceptions to that practice would have been the payment of one and one half years of taxes by Glenn which the family presumed to be in lieu of rental payments due from Glenn’s son Marc.  (Exhibit 2)

5. The only members of the Swanson family to sign oil and gas leases were Anna and William.

6. Throughout the course of events in this matter Glenn acted as William’s attorney.

7. In his capacity as William’s representative, Glenn managed the property and made arrangements with tenants — including his son Marc.

8. William was listed as the owner of the Property on all government program matters.  Glenn signed government program documents as power of attorney for William and never signed in his own individual capacity.  (Exhibits 12 and 15-18)

9. After William’s death Lorraine was listed as the owner of the Property on government program documents.  (Exhibits 19 and 20)

10. Glenn assured William that William was receiving all of the income from the Property and that William was to receive all payments under the farm program.  (Exhibit 13)

11. Glenn’s reputation within the family was that “he was shafting a lot of people” as testified to by Lorraine.

Given knowledge of the above facts by the Plaintiffs at the time they received their Deed, it can be concluded that they were acting properly when they proceeded to record their Deed.  This court believes that a reasonable person aware of the foregoing litany could have a rational belief that Glenn’s comment to Robert asserting ownership was either simply erroneous or a deceptive bluff.  In either event, this court finds and concludes that the Plaintiffs were acting in good faith when they became the record title owners of the Property.  There was just no evidence or circumstances which would lead anyone to think that Glenn really did have an ownership interest in the Property and 
he would not have been able to come up with a deed anyway
.

(Emphasis supplied).

[¶54] In 
Burlington Northern, Inc. v. Hall
, 322 NW.2d 233, 238 (N.D. 1982), we stated that one who has knowledge of the facts sufficient to put a prudent person upon inquiry with regard to the existence of an unrecorded deed but fails to make that inquiry cannot claim to be a bona fide purchaser under the recording act.  However, we also noted in that case that not only were the facts sufficient to put a prudent person upon inquiry:  

Such an inquiry would have necessarily revealed the terms of the contract for deed.  
Based on these factors
, we agree with the trial court that on l December 1948 Hall was chargeable with constructive notice of the terms of the l944 contract for deed between Mossers and Northwestern and that Hall purchased the land in question with notice that Northwestern had reserved the mineral interests. 

Id.
 at 238 (emphasis supplied).

[¶55] Here, it is apparent to me that the trial court found that had the children made inquiry they would not have anything, other than Glenn’s oral claims, which would have revealed the terms of the deed and I agree with Justice Sandstrom on that issue.

[¶56] However, 
a majority of this Court has held that to attain the protection under N.D.C.C. § 47-19-41 “as a good faith purchaser for value, the purchase must be for a valuable and not a nominal consideration.”  
Anderson v. Anderson
, 435 N.W.2d 687, 689 (N.D. 1989).  Further, “the party claiming to be a good faith purchaser has the burden of proof to establish valuable consideration from evidence other than the deed.”  
Id.
  Thus, for the Swanson children’s deed, executed June 18, 2003, and recorded July 21, 2003, to have priority over Glenn Swanson’s deed, executed June 10, 1963, and recorded on November 2, 2005, the Swanson children must prove they purchased the property in good faith and for a valuable consideration.

[¶57] In 
Anderson
, 435 N.W.2d at 688-90, the majority analyzed the element of valuable consideration under N.D.C.C. § 47-19-41.  The Court concluded as a matter of law that the consideration recited in a 1951 quit-claim deed did not constitute a valuable consideration, but was merely a nominal consideration.  
Anderson
, at 690.  The defendants failed to present evidence of any actual consideration.  
Id.
  Because the defendants had not provided valuable consideration, they were held not to be good faith purchasers for a valuable consideration under N.D.C.C. § 47-19-41, and could not claim priority over the plaintiffs by virtue of the 1951 deed.  
Anderson
, at 690.  In its analysis of what constitutes a valuable consideration, this Court explained that the consideration need not be an equivalent value to be valuable, but “it must be 
substantial and not merely nominal
.”  
Id.
 (emphasis added).

[¶58] Under 
Anderson
, therefore, to establish payment of a valuable consideration, the purchaser must show that in purchasing the property, the consideration given was “substantial.”  One treatise has observed that while such a definition may be easy to articulate, there can be exceptional difficulty in its application, because it does not provide a “‘safe harbor’ by which value may be conveniently and objectively measured,” but rather a “relative, and somewhat objective, test.”  14 
Powell on Real Property
 § 82.02[2][a] (2005).  Without specific quantification, the test attempts to balance “the value given by the purchaser against the fair market value of the land.”  
Id.

Nevertheless, there are a few definitive positions that may be observed.  On the one hand, the purchaser need not pay the fair market value of the property involved.  On the other hand, the purchaser clearly may not pay a truly nominal sum such as one dollar or ten dollars.  Similarly, the payment of consideration in the nature of love and affection will not suffice.  
While such forms of consideration may be adequate to support a contract, they are not adequate to constitute value under the recording acts
.  One key purpose of the recording act is to protect purchasers who, in fact, make economic investments of some substance.  Under that rationale, a bare promise to pay the purchase price 
or to give future support to the grantor
 is inadequate.  Logically, the requirement of value also excludes persons who are donees, heirs, or devisees from protection under the recording act.  For similar reasons a decedent’s personal representative does not have a status any better of that of the decedent.

Id.
 (emphasis added and footnotes omitted).  Another treatise has described the test this way:

One is not a purchaser for a valuable consideration, unless he has parted with money or money’s worth in consideration of the conveyance, that is, he must, as a consideration for the conveyance, have done some act by reason of which, if the conveyance were set aside, he would be in a worse pecuniary position than before.  
For this reason, an agreement by the grantee to support the grantor is not a valuable consideration, if it is in effect merely a condition on which he can retain the title, or merely a promise to pay, which would become ineffective in case of lack of title on the part of the vendor
.  Likewise, an earlier deed which is given for a valuable consideration and which is recorded after a later deed reciting consideration of love and affection has priority over the later deed.  But the assumption by the purchaser, as a part of the price, of a debt due by his vendor to a third person, whereby he becomes absolutely obligated to the latter, constitutes a valuable consideration.

5 
Tiffany on Real Property
 § 1300 (1939 & Supp. 2009) (emphasis added and footnotes omitted).

[¶59] Other courts have held that a grantee’s mere promise of future support to the grantor, while a good consideration in the ordinary sense, does not constitute a valuable consideration for purposes of recording statutes.  
See, e.g.
, 
Alexander v. O’Neil
, 267 P.2d 730, 734-35 (Ariz. 1954) (grantee who supported grantor during last years of her life and paid grantor $125 a month from income accruing from grantee’s management of conveyed property did not constitute a valuable consideration under recording act).  
See
 
Sparkman v. Triplett
, 167 S.W.2d 323, 326-27 (Ky. Ct. App. 1942) (grantee was not bona fide purchaser where sole consideration for land transfer was her undertaking to support grantor during his life); 
Falk v. Fulton
, 262 P. 1025, 1027 (Kan. 1928) (grantee agreeing to support and maintain grantor during life and furnish respectable burial held not a valuable consideration when against the interest of other or third parties); 
see also
 
Alexander v. Andrews
, 64 S.E.2d 487, 493-95 (W. Va. 1951) (grantee’s payment of $1,000 and understanding to care for grantor and provide for his burial held sufficient to give grantee benefit of recording statute “had it been paid in full at the time” the grantee first received notice of the former deed; however, since transaction was not complete, $1,000 payment was not adequate consideration for one-half interest valued at $3,850 in property).  
Compare
 
In re Estate of Jorstad
, 447 N.W.2d 283, 285-86 (N.D. 1989) (son’s promise to stay and farm parents’ farm was “sufficient consideration” under N.D.C.C. § 9-05-01, supporting an option contract to purchase farm), 
with
 
Anderson
, 435 N.W.2d at 689 (discussing what constitutes a “valuable consideration” under N.D.C.C. § 47-19-41).

[¶60] In 
Melendrez v. D & I Investments, Inc.
, 26 Cal. Rptr. 3d 413, 424-25 (Cal. Ct. App. 2005), the court acknowledged that a “purchaser for value” does not require the consideration be the property’s fair market value or anything approaching it, but rather the purchaser “need only part with something of value in exchange for the property.”  
Id.
 (citing 
Horton v. Kyburz
, 346 P.2d 399 (Cal. 1959) (rejecting that bona fide purchaser for value must give “adequate consideration” sufficient to obtain specific performance of a contract).  “The objective of the [recording statute protecting bona fide purchasers and encumbrancers] is to protect persons who have invested substantial sums of money or property, or who have performed valuable services, in reliance on an honest belief that they are acquiring a good title or lien.”  
Melendrez
, at 425 (quotation omitted).  
Cf.
 
First American Title Ins. Co. v. Action Acquisitions, LLC
, 187 P.3d 1107, 1111-12 (Ariz. 2008) (“‘[V]aluable consideration’ or ‘present equivalent’ exists if the purchaser surrenders a right or detrimentally changes a legal position ‘so that if the claim of title fails the purchaser is left in a worse position than he was before.’”).

[¶61] Here, Glenn Swanson testified at trial that the 160 acres of property at issue was worth about $500 per acre, but that the other land Lorraine Swanson had included in the trustee’s deed to her children was “very good land compared to this [property].”  As previously discussed, Lorraine Swanson as trustee of her trust conveyed the property at issue in this case, with several other parcels of land constituting approximately an additional four and one-half quarter sections of property.  James Swanson testified that Lorraine Swanson continues to receive the income from the property and pays the taxes and that there was an unwritten understanding between her and the Swanson children regarding the children’s care for her pertaining to all of the property.  When Lorraine Swanson was asked what the Swanson children paid for all of the land in that conveyance, Lorraine Swanson testified, “Ten dollar bill” and that her children would take care of her.  She also testified:

Q Okay.  Ms. Swanson, you believe that as a result of you giving your children this particular quarter of land that’s at—the southwest quarter of Section 33, do you think because of that your children are legally obligated to take good care of you?

A No, I think they love me and we—I love them and they’d take care of me regardless, but it was just an unspoken part of the deal.

[¶62] James Swanson, one of the Swanson children, also testified at trial regarding the consideration provided for the property conveyed by Lorraine Swanson as trustee:

Q What consideration, if anything, did you and/or your siblings provide to your mother in exchange for receiving ownership of these properties?

A Well it was Ten Dollars, which was kind of a joke but she insisted, and then other consideration in the fact that, you know, she was—she wanted the land to stay in the family.  She—we went ahead and bought the land to keep it in the family, and then we were going to provide for her just different needs that she should require.

Q Do you continue to—do you and your siblings continue to do that today?

A Absolutely.

Q Is that part of your agreement with your mother that—

A Very much so, yeah.

Q It was an agreement.

A Yeah.

Q Now I’m understanding the agreement that you would—you and your siblings would see to her uncovered needs, I guess would be—

A Yeah.

Q Uncovered economic needs.

A Absolutely.

Q But in addition to economic needs are you providing other things to her for this land?

A Yeah.  Well we’re—I mean, a lot of time and, you know, there’s consideration in the fact that we’re, you know, we buy her things, we do all sorts of things for the land.

Q Okay.  How far—

A Just taking care of her needs.  I mean she’s more at ease with her lifestyle and her income now because we are there to help her out.

. . . .

Q How frequent do your siblings come up to your mother’s to do things for her?

A My brother, Bob, probably is there twice a month.  My sister and brother-in-law probably once a month, and my brother, Mike, at least once a month.

Q And you live only a few miles away?

A Right.

Q And do you and your wife provide services for her?

A Absolutely.

Q Now the question I know is going to be asked because it was asked of your mother, would you be obligated to pay the financial things that you provided to her aside from the agreement that you had with this land?

A Yes, sir.

Q You would still.  But that would be morally obligated.  How about legally obligated?

A Well no, I suppose not.

Q But you are legally obligated because you entered into an agreement with her?

A Oh, yeah.  Yeah.  Yeah, basic—I mean we—I mean that’s why she gave us the land.

Q Because you kids promised—

A We would take care of her and, you know, in her old age—

Q Okay.

A  —and all of the needs she—

Q But you also just take care of her . . . That’s probably a moral thing as to children helping mom and dad.

A Oh. Well—

Q But economically that’s because of the agreement?

A Yes, Sir.

Both Lorraine Swanson and James Swanson testified that ten dollars was paid as consideration for the conveyance of the trust property, which included the property at issue in this case, and that Swanson’s children provided Lorraine Swanson financial support and various services, including multiple monthly visits, rides to medical appointments, and payment of some expenses.  However, it is unclear on this record what the value of the support and services was, nor did the district court make a finding as to the financial value, if any, of this agreement.

[¶63] In its memorandum opinion, the district court found the Swanson children provided valuable consideration in payment for the conveyance from Lorraine Swanson’s trust “consist[ing] of ten dollars in cash and the promise or commitment that they would take care of her in the future.”  The court found the testimony of Lorraine Swanson and James Swanson confirmed the Swanson children had performed services for Lorraine Swanson and that they have assisted her “with business affairs and transportation.”  The court stated the issue as whether the Swanson children’s promise or commitment is of substantial value.  The court then stated, “Perhaps the best way to make this determination is to look at it from the perspective of Lorraine.  Did Lorraine receive something of substantial value?”

[¶64] The district court found that Lorraine Swanson was “very pleased” with her arrangement in that her children would take care of her, that she needed a lot of care, and that she has received the ability to call on any of her children for assistance without feeling guilty or intruding on her children’s lives.  The court concluded that Lorraine Swanson had a deal with her children and that she had “peace of mind” and “believe[d] that she ha[d] entered into an arrangement which is 
of substantial value to her
.”  (Emphasis added.)  The court concluded this “business arrangement” resulted in a daily benefit “worth far more to [Lorraine Swanson] than land hundreds of miles away from home,” and therefore constituted a “valuable consideration.”

[¶65] Here, it is apparently undisputed that Lorraine Swanson as trustee did not pay valuable consideration to William Swanson’s estate for the property at issue.  Lorraine Swanson testified that when she conveyed the property to her trust as William Swanson’s personal representative, her trust did not pay anything to the estate.  She stated, “If you inherit something from your husband you don’t have to pay for it.”  However, in light of Lorraine Swanson’s signature on the 1963 warranty deed that conveyed the property to William Swanson and Glenn Swanson as joint tenants, upon William’s death she would have had no interest in the property to convey to herself as trustee.  
See
 
Neuberger v. Dally
, 210 N.W.2d 269, 272 (N.D. 1973) (upon death of joint tenant, real property title held in joint tenancy vests in surviving joint tenant and does not become part of the decedent’s estate) (citing 
In re Kaspari’s Estate
, 71 N.W.2d 558 (N.D. 1955)).  Under the facts as found by the district court, Lorraine Swanson succeeded to no interest in the property at issue in this case.

[¶66] Further, Lorraine Swanson testified that when her trust transferred the property to the Swanson children as part of a larger transfer of property, the Swanson children paid ten dollars and have provided her support as a result of the transfer.  Although the district court found that the conveyance of the property from Lorraine Swanson’s trust to the Swanson children was supported by a valuable consideration, the court erred in determining whether the consideration had a value that was substantial “to her.”  In determining whether the consideration the Swanson children provided was substantial, and thus valuable under N.D.C.C. § 47-19-41, the analysis must balance the value given by the purchaser against the fair market value of the property and determine whether the purchaser has parted with something of value.

[¶67] While I do not provide any specific percentage for defining what amount would be substantial, the purchaser must part with something of value in exchange for the property.  
See
 
Melendrez
, 26 Cal. Rptr. 3d at 424-25.  Further, while the amount of consideration may reflect on the purchaser’s good faith, this does not preclude consideration from being valuable.  
Id.
 at 425.  To be substantial, the purchaser must have made some payment, surrendered some right, or done some act, such that if the purchaser’s claim of title fails, the purchaser is left in a worse position than before the transaction.  
See also
 
First American
, 187 P.3d at 1111; 
but see
 
Morris v. Wicks
, 106 P. 1048, 1048 (Kan. 1910) (“Under some circumstances the amount paid may be so insignificant in comparison with the value of the property as fairly to be deemed unsubstantial on that account.”)

[¶68] Because the district court erred as a matter of law in its analysis of whether Lorraine Swanson’s children provided a valuable consideration under N.D.C.C. § 47-

19-41, I would reverse and remand to the district court for reconsideration of whether the Swanson children paid a valuable consideration for the property at issue in this case.

[¶69] Gerald W. VandeWalle, C.J.